Syllabus.

# ARTHUR D. RICH *et al.*

## *v.*

# THE CITY OF CHICAGO.*

1. SPECIAL ASSESSMENT—*oath of commissioners.* Where a special assessment was made for the improvement of a street in a city, it is not an objection to the validity of the assessment that the commissioners took the oath required by the city charter, and also superadded other clauses not inconsistent with the oath required by the charter, or any of its provisions.

2. NOTICE—*publication—city newspaper.* Where the city charter required the common council to designate a newspaper in which notices and the proceedings of the corporation should be published, it appeared that such notices and proceedings were published in a particular paper, and it was recognized by the officials as the corporation newspaper,—a certificate of publication given by the publisher, was offered in evidence: *Held,* that such facts, as to the public, and third persons, were *prima facie* evidence that the paper had been designated as the corporation paper, and the appointment need not be proved by producing the record showing the appointment; that it is similar to proof that a person has acted as a public officer, which is *prima facie,* without producing his commission.

3. FORMER DECISIONS—*awarding compensation, when private property is taken for public use.* The determination of what is "just compensation" for private property when taken for public use, is a judicial act, which can properly be performed only by the judicial department of the government, and former decisions of this court holding the award in that regard, of persons not of the judicial department, such as the commissioners of the board of public works in the city of Chicago, to be conclusive, are overruled.

4. CONSTITUTION—*eminent domain—trial by jury.* Where a city charter gave to the common council, and the board of public works, power to

---

*This case, and the following twenty-one cases, are all considered in the same opinion:

*Trustees of Wabash Avenue Baptist Church* v. *City of Chicago; Snoad* v. *Same; Hoxie* v. *Same; Pearce* v. *Same; W. Davidson* v. *Same; Christ Church* v. *Same; Otis* v. *Same; J. I. Pearce* v. *Same; Kellogg* v. *Same; E. L. Davidson* v. *Same; Loomis* v. *Same; Larmon* v. *Same; Little* v. *Same; Whittaker* v. *Same; Mason* v. *Same; Spaulding* v. *Same; Traynor* v. *Same; Frisbee* v. *Same; Frank* v. *Same; Thomas* v. *Same; Larned* v. *Same.*

assess damages on the condemnation of land for the widening of a street, and it was objected that the act was unconstitutional, because the owner was deprived of a jury: *Held*, that as the court had, in previous decisions, sustained the law, the rule *stare decisis* must be applied, and as the constitution of 1870 requires a trial by jury in all future cases, the question is not of any practical importance to determine whether a jury was indispensable, and that rights acquired under former proceedings should be protected.

5. ASSESSMENT—*benefits.* But the proceeding to assess the damages growing out of the opening of the street, is not obnoxious to any constitutional objection. The charter makes it indispensable for a sale of real estate for the payment of such an assessment, that a judgment of some court of general jurisdiction be had upon the warrant. The acts of the commissioners may be considered ministerial, and as the means by which the proceedings instituted are to be brought before the court, and for that purpose are valid. All questions pertaining to the damages sustained or benefits conferred by the condemnation of land, or other property, for public use, may be raised and tried in the court where judgment is sought on the warrant.

6. ORDINANCE—*validity of.* Where such an improvement is proposed, and it is not petitioned for by a majority of the owners of property to be assessed, the charter declares that it shall be ordered only by the votes of at least three-fourths of all the aldermen present, such vote to be by ayes and noes on the record of the common council. And if, when the record is presented, it does not appear that the improvement was ordered by a vote of three-fourths of the aldermen present, and the vote was not entered by ayes and noes: *Held*, that the ordinance is void, and judgment for a sale of the property to pay the assessment, can not be rightfully entered.

7. NOTICE—*publication—certificate.* Where there was published a notice of application for a confirmation of the assessment, and the publisher certified that the notice had been published six days consecutively, excepting Sundays and holidays, giving the date of the first but not the last publication: *Held*, the certificate was too indefinite, and was insufficient.

8. CONVENING ORDER. When a record is presented to this court on error, it should have a *placita*, that it may appear that the record presents the proceedings of a court.

APPEALS from the Superior Court of Cook county; the Hon. JOSEPH E. GARY, Judge, presiding.

Mr. EDWARD ROBY, for the appellants.

Mr. M. F. TULEY, city counsel, for the appellee.

Mr. JUSTICE MCALLISTER delivered the opinion of the Court:

These cases purport to arise upon proceedings instituted by the corporate authorities of the city of Chicago, for the condemnation of land, in order to widen Michigan Avenue from Twenty-second to Thirty-second street, in the city.

Application was made at the March term, 1870, of the Superior Court of Chicago, for judgment upon the collector's report, and judgment ordered, from which an appeal was taken to this court.

The questions presented, which we propose to consider, being common to all of the cases, they will, consequently, all be treated as one case.

The first point made, questions the sufficiency of the oath taken by the commissioners. The 6th section of chapter 7, of charter, (Gary's Laws 1866, p. 62,) declares that, "before proceeding to make said assessment, the commissioners shall be sworn faithfully to execute their duties according to the best of their ability."

The oath which was taken, not only contains the very language just quoted, but goes further, and specifies certain duties, but not all, which they were required to perform in the premises. These specifications being consistent, as far as they went, with the oath which they were required to take, can not vitiate the proceeding.

The second objection is, that it was not sufficiently shown that the newspaper in which certain notices were claimed to have been published, had been duly designated as the corporation newspaper.

There was, at least, *prima facie* evidence that the "Chicago Republican," the paper in question, was the corporation newspaper. The charter, in every instance except one, where notices are required to be published, says, that they shall be published in the "corporation newspaper." This paper was conducted as the corporation newspaper, and the fact seems to

have been notorious. All official acts of the city, required to be published, had, for a long period of time, been published in it; so that, as affecting the public and third persons, proof that the paper in question was conducted notoriously as the corporation newspaper, and so recognized by the city authorities, was *prima facie* sufficient without introducing the resolution of the council designating it as such.

All rules of evidence are adopted for practical purposes in the administration of justice, and must be so applied as to promote the ends for which they were designed. Wherefore the general rule, that the best evidence of which the case, in its nature, is susceptible, must be produced, is subject to exceptions where the general convenience requires it. "Proof, for example, that an individual has acted notoriously as a public officer, is *prima facie* evidence of his official character, without producing his commission or appointment." 1 Greenlf. Ev. sec. 83.

The third objection assails the foundation of the entire proceeding, and is one of a graver character. The appellants' counsel insists, that the judgments should all be reversed, on the ground that the provisions of the city charter, relative to the taking of private property for public use, are unconstitutional and void, because they purport to vest the board of public works and the common council of the city of Chicago with authority to inaugurate proceedings, in their discretion, for taking such property; to determine all preliminary facts, and fix the compensation to be made; to effectuate, by their own acts, the condemnation of the property of the citizen, and divest him thereof; and their decision is made final and conclusive. This, it is claimed, is the exercise of judicial authority, which, by the division of the powers of the government by the State constitution, is expressly prohibited to all departments of the government not belonging to the judicial; neither the board of public works nor common council can be said to belong, in any sense, to the judicial department.

19—59TH ILL.

On the other hand, the counsel for the corporation insists, that none of the guarantees of the constitution, as to the inviolability of private property, have any application to the exercise of the right of eminent domain ; that it is the attribute of political sovereignty, an inherent political right, whose exercise is an act of public administration, and the form and manner of its performance is such as the legislature may prescribe ; that "the State, through the legislature, is only restricted in the exercise of the power by the express limitation on the power, *eo nomine,* contained in the constitution, to-wit : the making of just compensation." He claims that, notwithstanding this limitation upon the power, it is a subject resting entirely within legislative discretion, and beyond the domain of the judicial department, for he says, that "the constitutional provisions, as to the division of the powers of government, have no application to the exercise of the right of eminent domain."

If we correctly understand the position of the counsel, it is that of legislative supremacy over private property, taken or applied to public use, as absolute as that asserted and conceded on behalf of the British parliament. The absolutism of the English parliament is fully asserted in the following decision : In speaking of turnpike acts, paving acts, etc., Lord KENYON said : "If the legislature thought it necessary, as they do in many cases, they would enable the commissioners to award satisfaction to the individuals who happen to suffer. But if there be no such power, the parties are without remedy, provided the commissioners do not exceed their jurisdiction." *Governor, etc. v. Meredith,* 4 Term R. 795.

We had supposed, that the restraints which have been placed upon the supremacy of legislatures over the rights of private property, was a distinguishing feature of the American from the English system.

The right to "just compensation," required by our constitution to be made as a condition precedent to the exercise of the

right of eminent domain, is of little value if the legislature may vest the power of final adjudication in any sort of a tribunal it chooses. Of what value would all the vaunted rights of freemen be, if the legislature could clothe every petty magistrate in the land with authority to pass final decrees of forfeiture of such rights as caprice, malice, or popular clamor, might dictate?

Rights of persons, and of property, may be recognized in the theory of government as fundamental and sacred; may even be solemnly enunciated in the constitution; still, so long as they exist only in contemplation of law, and are left without the adequate means for their protection and enforcement, they are of no more practical value to the individual than the most barren abstractions of theorists.

The decisions of other States have been cited to show that, in choosing the instrumentalities through which compensation shall be ascertained, the discretion of the legislature has no limit. We can say, with confidence, that the constitutions of some of these States are unlike ours. To those of some of the other States, whose decisions are referred to, we have not access, but, from the decisions themselves, must conclude that they are essentially different. We will take, for example, the language of the supreme court of Pennsylvania, quoted by the counsel for the city: "The assessment by the canal commissioners," say the court, "is as fully authorized by the constitution as an assessment by any other tribunal. A sovereign State is not liable to an action at law against her consent, and the right of trial by jury has no existence in such case. The *mode* of assessment *rests with the legislature,* and the common law courts have no authority to question the justice of the decrees of tribunals clothed with power to make final adjudication on the subject." *Segat* v. *Commonwealth*, 19 Penn. St. R. 460.

Here, the award is characterized as a "decree"—a "final adjudication of the subject"—and the canal commissioners are termed a tribunal, authorized by the constitution.

But where, among all the provisions of the constitution of 1848, under which the charter of Chicago was passed, will be found any authority to create such a tribunal?

The commissioners of the board of public works are mere ministerial officers, and the common council a *quasi* legislative body. Whence does the legislature derive authority to create either, or both, into a tribunal, to hear, and finally determine, questions of law and fact, to pass decrees, and make formal adjudication of the subject?

The counsel says, by virtue of an inherent political right— the attribute of political sovereignty—the power of public administration upon private property, whenever the public might require its appropriation. He says: "The right of eminent domain is inherent in sovereignty, and exists *dehors* the constitution, and no provision of a constitution, which, by its terms, does not refer to that right, has been held by the courts to be any limitation upon the legislature as to the mode in which the power is to be exercised."

There is no doubt, but the right in question is inherent in sovereignty, like the power of taxation; and, without constitutional restraints, the only security which the citizen would have from an unjust and oppressive exercise of it, would be in the wisdom and justice of the representative body, and its dependence on its constituents. But that security has not been deemed sufficient. Limitations, requiring equality and uniformity, have been placed by the constitution upon the power of taxation, which, when disregarded or transcended by the legislature, may authorize the withdrawal of the subject from what would, otherwise, be the arbitrary discretion of that body, and bring it within judicial cognizance. *City of Chicago* v. *Larned,* 34 Ill. 203; *The People* v. *Bradley,* 39 ib. 130; 44 ib. 229, 240.

So, in the same spirit of jealousy, the bill of rights declares: "Nor shall any man's property be taken or applied to public use, without the consent of his representatives in the general assembly, nor without just compensation being made to him."

Is not this a reference, in terms, to the right? And is it not obvious, that the legislature can not do as it chooses, and leave those, who happen to suffer by the exercise of the right, without remedy, or with a nominal one only, as the English parliament may? The language is not directory; it is negative—prohibitory; that is, the right shall not be exercised at all, except upon the condition of *just* compensation being made to the owner. Who shall determine what is *just* compensation? If the legislature, in its discretion, can prescribe both the tribunals, and the elements of the judgment, then the decrees of such tribunals, no matter how far short of the constitutional requirement, would be final and conclusive, and the party affected left without other remedy, so long as the particular tribunal kept within its jurisdiction. Such consequences could not have escaped the vigilant attention of the framers of the constitution.

By section 2 of article 9 of the constitution, it is declared that: "The general assembly shall provide for levying a tax by valuation, so that every person and corporation shall pay a tax in proportion to the value of his or her property." The act of fixing valuation and making assessments, is judicial in its nature. *Weaver* v. *Devendorf,* 3 Denio R. 117; *Prosser* v. *Secor,* 5 Barb. R. 607.

But, so careful were the framers of the constitution to preserve harmony of principle in that instrument, and at the same time establish a convenient mode of exercising the power of taxation, as limited, the section further provides: "Such value to be ascertained by some person or persons, to be elected or appointed in such manner as the general assembly shall direct, and not otherwise." If they had intended that the question of "just compensation," when private property should be taken or applied to public use, should, like that of valuation for the purposes of taxation, be ascertained by such person or persons as the general assembly should direct, would they not have said so? If such had been the intention, why is the authority expressly given in the one case, and omitted

in the other? We think such was not the intention, and that it is apparent, from the whole instrument, that in exercising the right of eminent domain, it was intended that the legislature should address itself to the judiciary. Limitations are placed upon the sovereign power, both of taxation and eminent domain, by requiring uniformity and valuation to be the standard of the former, and just compensation as a condition to the exercise of the latter. The act of ascertaining the value is, as we have said, judicial in its nature. The constitution carefully authorizes the designation of persons, not of the judicial department, to ascertain the value for the purposes of taxation, but as carefully withholds authority to designate any person or special tribunal to assess compensation for taking private property. It declares a division of the powers of the government into three *distinct* departments, and that each of those departments shall be confided to a *separate* body of magistracy, to-wit: those which are legislative to one; those which are executive to another; and those which are judicial to another. Then follows this emphatic prohibition: "No person, or collection of persons, being of *one* of these departments, shall exercise *any power properly belonging to either of the others*, except as herein expressly directed or permitted; and all acts in contravention of this section shall be void."

If the determination of the question of just compensation, with its incidents, be in its nature a judicial proceeding, then, under which department does the power to make it, properly belong? To this question there can be but one answer, and that is, to the judicial department.

Here, then, the question arises: Is the determination of that question, with its incidents, a judicial act?

"The award," says Pierce, speaking of condemnation of land for railroad purposes, "is a judicial act, and unless appealed from, becomes, like a judgment at law, *res judicata*, and can not be collaterally impeached." Pierce on Railways, p. 168, and note 1, where many authorities are cited in support of the text.

Judge Cooley, in his excellent work upon Constitutional Limitations, speaking of the same subject, says: "What the tribunal shall be which is to assess the compensation, must be determined either by the constitution, or by the statute which provides for the appropriation. The case is not one where, as matter of right, the party is entitled to a trial by jury, unless the constitution has provided that tribunal for the purpose. Nevertheless, the proceeding *is judicial in its character*, and the party in interest is entitled to have an impartial tribunal, and the usual rights and privileges which attend judicial investigations." Cooley Const. Lim. 563.

We have given expression to the views of a majority of the court, and it is apparent, from what has been said, that, if the question were a new one, we should have great difficulty in reconciling with the constitution the taking of private property for public use, without ascertaining the compensation through the machinery furnished by the judicial department of the government.

We are, however, of the opinion, that this proceeding, which is for the assessment of the damages against property specially benefited, is open to no constitutional objection. The 9th chapter of the charter makes it indispensable to a sale of real estate, for payment of such an assessment, that a judgment of some court, of general jurisdiction, be had upon the warrant. The acts of the commissioners may therefore be considered as ministerial, and not judicial. They are the means by which the proceedings are initiated and the cause brought before the court, and for that purpose are valid.

It follows, from what has been said, that, upon the proper objections being made in the court to which application is made for judgment, all questions pertaining to the damages sustained, or benefits conferred by the proposed condemnation of land, or other property, for public use, may be raised and tried in the court in which judgment is sought upon the warrants, and the right to raise for decision any question going to

the jurisdiction of the court, is one which pertains to all judicial proceedings, and can not be denied in these cases.    *Creote* v. *Chicago,* 56 Ill. 422.

In the opinion of a majority of the court, the former decisions, holding the award of the commissioners conclusive, should be overruled.   This is a question, merely, of procedure, as to which the former rulings of the court may be changed, without injury to any one.

But courts are controlled by a different principle in regard to past decisions, under and upon the faith of which the community has acted for a series of years, and as to which a change of decision would lead to great public embarrassment and confusion by disturbing the rights of both public and private property.

It must not, therefore, be inferred, from what has been said, that we are disposed to hold invalid the almost innumerable condemnations which have been made in past years for streets, highways, railroads, and other public purposes, under statutes which provided no mode for bringing the matter in issue before the judicial department of the government.   This court expressly decided, in 1859, that the power of eminent domain might be exercised by the ascertainment of compensation, by commissioners, under laws providing no mode of appeal to the judicial power.   During the thirteen years that have since elapsed, the legislature and the public have acted under the authority of that decision.   Not only has land been condemned in this manner for streets in cities, and railway purposes, but all public highways, in counties under township organization, have been opened under a law which provided no mode of appealing to the courts.

The constitution of 1870, having abrogated this mode of condemnation, and, by express language, made it indispensable to the exercise of the right of eminent domain that the compensation shall be ascertained by a jury, and consequently in a judicial proceeding, it is therefore unnecessary for this

court to overrule its former decision for the protection of private property in the future. A decision overruling the former one, would act practically, only, upon the past, and the effect would be only disastrous, and disastrous in an extreme degree. We deem it inconsistent with our judicial duty, and the true spirit of conservatism which should govern courts, to pronounce such a judgment.

We have discussed this question because argued at length by counsel, and to assert what a majority of the court hold to be correct principles. But as the question is rendered, by the new constitution, of no practical importance for the future, we deem it our duty to apply the doctrine of *stare decisis*, when asked to make a decision that would close so many streets and highways, and be productive of so much litigation and confusion, without any compensatory results, either to the public or private individuals.

For the reasons assigned, we do not hold these judgments reversible for the unconstitutionality of the statute, but there are other errors assigned that are fatal.

Appellants, amongst other objections, filed the objection to the judgments, that there was no valid ordinance commanding the improvement, or the assessment to be made. Upon the hearing, the objectors introduced a certified copy from the office of the city clerk, of all the proceedings of record, from the first report of the commissioners recommending the work. In that report, they stated, that the improvement was not asked for by the petition of the owners of a majority of the property to be assessed. In such case, the 4th section of chapter 7 of charter, (Gary's Laws, p. 62,) declares, that the improvement "shall be ordered *only* by the votes of at least three-fourths of all the aldermen present, such vote to be entered by ayes and noes on the record of the common council." It does not appear, from the record introduced, or otherwise, that this improvement was ordered by the votes of three-fourths of all the aldermen present, and it appears, affirmatively. that

the vote was not entered by ayes and noes on the record. We must, therefore, regard the objection as well taken.

From such certified copy of record given in evidence, it also appears, that the only proof of the notice, by the commissioners, of their meeting to make the assessment, or of making application to the council for confirmation, was a certificate, purporting to be made by the publisher of the corporation newspaper, that the notices had been published in that paper six days consecutively, excepting Sundays and holidays, commencing with a particular day, but not stating the date of the last paper containing the same, as the statute requires.

There was no evidence, on behalf of the city, that these notices were, in fact, published. When the objectors introduced the whole record, which failed to show that the notices were given as required by the charter, the *onus* was cast upon the city to prove the fact by competent evidence. Failing to do so, the intendment must be against the fact. There is still another ground of reversal: None of the records contain a *placita*. *Lawrence* v. *Fast*, 20 Ill. 338; *Dukes* v. *Rowley*, 24 Ill. 210.

For the reasons given, these judgments must be reversed and causes remanded.

*Judgments reversed.*