DAVID W. DAY, PLAINTIFF, V. HENRY J. WALKER, SECRETARY, ET AL., DEFENDANTS.

FILED MARCH 4, 1933. No. 28747.

*Paul F. Good, Attorney General,* and *Daniel Stubbs,* for plaintiff.

*Clarence G. Miles,* for defendants.

Heard before GOSS, C. J., ROSE, DEAN, GOOD, EBERLY, DAY and PAINE, JJ.

GOOD, J.

This is an original action in this court in which plaintiff seeks to enjoin defendants, as officers and agents of

the state, from enforcing the provisions of sections 71-2020 and 71-2023, Comp. St. 1929, on the ground that said sections have been repealed by the 1933 session of the legislature.

Defendants contend that the repealing act is invalid, because, on final passage of that act in each house of the legislature, the vote of the members was not taken *viva voce,* as required by the Constitution, and that said original sections remain in force. Defendants concede that said original sections have been amended and repealed if house roll 56 of the 1933 session of the legislature was legally passed.

It is alleged in the petition and admitted by defendants' demurrer thereto that there has been installed in each of the legislative halls an instrument and device known as the electric roll call system. This system provides for a board above and back of the presiding officer's position. On this board appear the names of all members of that particular branch of the legislature and opposite the name of each are three columns which are designated "Yea," "Nay" and "Not voting.". Upon the roll call each member presses an electric button at his desk which instantly records on the board his vote, yea or nay, and if he does not vote he is marked in the third column as not voting. The names of the members and how the vote is cast are plainly visible to all persons in that legislative hall, so that every person present may be, unless blind, fully advised as to how each member voted on the roll call.

It is admitted that the electric roll call system would be a great convenience, would conserve the time of the members of the legislature, and would make a considerable saving to the taxpayers. But defendants urge, notwithstanding the desirability of having the system installed and using it, it may not be done under the present constitutional provisions.

Section 11, art. III of the Constitution, provides in part: "All votes in either house shall be *viva voce.* The doors of each house, and of the committee of the whole

shall be open, unless when the business shall be such as ought to be kept secret." Section 13 of the same article provides in part: "No bill shall be passed by the legislature unless by the assent of a majority of all members elected to each house of the legislature, and the question upon final passage shall be taken immediately upon its last reading and the yeas and nays shall be entered upon the journal."

Plaintiff contends that the primary object of the framers of the Constitution in providing a *viva voce* vote on all questions was to give publicity to their acts, in contradistinction to a secret vote or ballot; so that the people, and particularly the constituents of each member, might know precisely how he voted and have a record thereof; and contends that every purpose of the framers of the Constitution is fulfilled in the use of the electric roll call device.

Defendants contend, on the other hand, that the provision of the Constitution is imperative and cannot be varied from, and at the same time they admit that if any member is mute, or is unable to use his voice, he is not thereby deprived of his right to vote upon the measure. It appears to us that this is an admission that the provision relative to *viva voce* voting is not imperative. While not likely, it is possible that a considerable number of members of one or the other house of the legislature might be so afflicted as to destroy, for the time being, their vocal powers. Certainly, these members would not be deprived of the right to vote because, at the time, they were voiceless.

The question presented amounts to this: Shall an act of the legislature be declared invalid because, in its passage, the legislature has not followed the strict letter of the Constitution, but has complied with every requisite according to the spirit thereof?

In 15 Cyc. 345, it is said: "The subject of *viva voce* voting is not now of much importance, although some traces of it are still to be found in minor elections such

as those for school officers. An interesting question has been presented as to the rights of deaf and dumb persons, where the law requires that votes shall be personally and publicly given *viva voce,* and it would seem to be the better opinion that they have the right to vote if they possess the qualifications of voters."

The Constitution of Kentucky formerly provided that votes shall be publicly and personally given *viva voce.* In a contested election for member of congress, the house of representatives of the United States held that the votes of deaf and dumb persons should be received, as clearly within the spirit of the Constitution. Bouvier's Law Dictionary defines *viva voce* voting as opposed to ballot.

In *Spickerman v. Goddard,* 182 Ind. 523, and particularly at page 526, it is said: "Voting by ballot involves secrecy while *viva voce* voting insures publicity. The word 'ballot' was used as a symbol of secrecy while *viva voce* was used as the symbol of publicity. There was nothing sacred in the contrivance of a strip of paper with names or questions printed thereon, which the framers sought, to preserve by the use of the word 'ballot;' nor was there any imperative necessity for the use of the voice of the legislator which moved the convention to decree its perpetual exercise in legislative elections. The constitutional limitation is not violated by dispensing with the use of the paper contrivance in the one case, or the legislator's natural voice in the other, if, in the former the people may choose in secret, and in the latter the legislator must make a public expression of his choice." In the opinion it is further pointed out that the Constitution "requires the opinions of this court to be given 'in writing.' At the time of the convention, the opinions were delivered in the handwriting of the judges, with pen or quill as the mechanical device used. The object of course was not to preserve the mere handwriting of the judges, but to provide a permanent record of the court's reasons for its mandates. An opinion as then written could be filed as a permanent record, and

consequently the word 'writing' was used to symbolize the purpose of requiring a permanent record. In recent years the court's opinions have been printed on typewriting machines, and thereby the inconvenience resulting from poor handwriting has been eliminated, and no one has been so narrowly technical as to claim the Constitution has been violated by the innovation." To the same effect is *Williams v. Stein*, 38 Ind. 89.

Another question somewhat akin is the use of voting machines at general and municipal elections. In most of the states the constitutional provision is that the voting shall be by ballot. Yet in many states voting machines, which entirely dispense with the ballot, have been held not to be in violation of the constitutional provision, on the theory that, where the voting machine provided a means whereby the voter could exercise his choice as to candidates or measures, and could cast his vote so that his choice of men or measures was secret, it was a sufficient compliance. Among the cases so holding is *Elwell v. Comstock*, 99 Minn. 261. In the opinion in that case it is said: "Constitutions are not made for existing conditions only, nor in the view that the state of society will not advance or improve, but for future emergencies and conditions, and their terms and provisions are constantly expanded and enlarged by construction to meet the advancing and improving affairs of men."

In *Henshaw v. Foster*, 9 Pick. (Mass.) 312, speaking of a constitutional provision, it is said: "We are to suppose that those who were delegated to the great business of distributing the powers which emanated from the sovereignty of the people, and to the establishment of rules for the perpetual security of the rights of person and property, had the wisdom to adapt their language to future as well as existing emergencies; so that words competent to the then existing state of the community, and at the same time capable of being expanded to embrace more extensive relations, should not be restrained to their more obvious and immediate sense, if, consist-

ently with the general object of the authors and the true principles of the compact, they can be extended to other relations and circumstances which an improved state of society may produce."

In speaking on the same subject, the supreme court of Montana, in *State v. Keating*, 53 Mont. 371, holds: "In interpreting a constitutional provision, the language used therein must be taken as having been designed to meet the needs of a progressive society, and should not be strictly confined to its meaning as understood at the time the instrument was adopted."

There are many other cases from other courts which hold that the adoption of voting machines for voting, where the Constitution provides that the voting shall be by ballot, is not in violation of such constitutional provision. In those cases it was pointed out that the object of the provision was to secure to the voter absolute freedom in the selection of men and measures to be voted for, and at the same time permit him to cast his vote so that no one except himself would know how he voted. The voting machine permitted that. The question we have before us is the direct reverse. The object and purpose of the constitutional provision was to give publicity and required each member of the legislature, voting on the passage of a bill, to vote publicly and have his vote recorded on the journal. It was publicity that was aimed at. The electric roll call device provides that publicity.

On the final passage of a bill by the legislature, the Constitution requires yeas and nays to be recorded on the journals of each house, but does not require the journals to show that the members voted *viva voce*. We think this omission is significant. Had the framers of the Constitution considered *viva voce* voting of vital importance, they would have required the journals to show that fact. We are impelled to the view that the use of the electric roll call device on the passage of house roll 56 did not render the act invalid.

There is another reason why we are precluded from holding that house roll 56 was not legally passed by the legislature. It has long been the rule in this court, and we think in most courts, that, in determining whether an act has been properly passed by the legislature, the journals of the respective legislative houses are the best evidence, and whatever the journals show may not be impeached, but must be accepted. *State v. Abbott,* 59 Neb. 106; *State v. Junkin,* 79 Neb. 532. The court takes judicial notice of the contents of the journals of the houses of the legislature. *Elmen v. State Board of Equalization & Assessment,* 120 Neb. 141; *State v. Frank,* 61 Neb. 679.

The journals in this instance show that house roll 56 was duly passed. The yeas and nays were recorded on the journals of the house and senate. This is a record that complies with the constitutional requirement, and shows that the bill was properly passed. We may not go behind that record. Whether the requisite number of representatives and the requisite number of senators voted for a bill on its final passage is absolutely determined by the house and senate journals. The record itself, in this case, presupposes that the bill was regularly passed. But, aside from this, the question of whether they should resort to the electric roll call system, or the old-style *viva voce* voting, is a question entirely within the discretion of the legislative bodies. So long as the system used gives publicity to the member's vote, and his yea or nay vote is properly recorded on the journal, no other requirement in that respect is necessary.

We therefore conclude that house roll 56 was validly enacted and that sections 71-2020 and 71-2023, Comp. St. 1929, have been amended and repealed, and may no longer be enforced.

Plaintiff is entitled to the relief demanded.

JUDGMENT ACCORDINGLY.

ROSE, J., dissenting.

The question presented is the power of the legislature,

in absence of a constitutional amendment, to depart from the provision of the Constitution relating to the passage of legislative bills and declaring that "All votes in either house shall be *viva voce,*" and enact a law by means of voting machines.

No law can be enacted except by majority votes cast in the specific manner prescribed by the Constitution, which declares:

"No bill. shall be passed by the legislature unless by the assent of a majority of all members elected to each house of the legislature, and the question upon final passage shall be taken immediately upon its last reading and the yeas and nays shall be entered upon the journal." Const. art. III, sec. 13.

Upon final passage of a bill there is only one lawful way of ascertaining the "assent" of the majority and that is by yeas and nays *viva voce.* The framers of the Constitution and the people who adopted it did not permit the legislature to select its own method of voting on the final passage of a bill, but provided a specific mode having a definite meaning for that purpose. The Latin phrase, *viva voce,* as used in the Constitution, means "With the living voice" or "By word of mouth." In addition, it has been defined in a standard law dictionary as follows:

"As descriptive of a species of voting, it signifies voting by speech or outcry, as distinguished from voting by a written or printed ballot." Black's Law Dictionary, 1211.

It has had this definite meaning in legislative halls, in city councils, in meetings of voluntary associations, and in other bodies, and in common speech since long before the Constitution was adopted. It was so accepted and obeyed by all departments of government until the present legislature attempted to adopt a bill by casting votes on its final passage with mechanical devices. The new method substitutes mechanisms for vocal utterances, a departure from the Constitution which makes the human voice a necessary element of a lawful vote on the final passage of a bill. Following the provision that "All

votes in either house shall be *viva voce,*" the supreme law commands:

"The doors of each house, and of the committee of the whole shall be open, unless when the business shall be such as ought to be kept secret." Const. art. III, sec. 11.

In voting for or against a bill on its final passage, a legislator must be prompted by such a conviction or sense of duty as enables him to use his voice in a legislative hall with open doors. The oath of each member of both houses contains a solemn vow to support the constitutional method of voting by use of the human voice. Throughout the entire history of legislation in Nebraska this exclusive method was never questioned until the use of the voting machine was proposed.

When the people in creating a system of government depart from the ordinary business of framing and adopting a written Constitution to prescribe a definite mode for the exercise of legislative power in a particular instance, the method adopted is deemed to be of vast importance and cannot be exercised in any other manner. The mode adopted is a limitation on power. A provision of that kind is mandatory and the courts tread upon very dangerous ground when they venture to say that the requirement is merely directory and that power may be exercised in a different manner. In substance these are views of an outstanding text-writer who reviewed the authorities and discussed the subject at length. Cooley, Constitutional Limitations (7th ed.) 114. The constitutional method openly places lawmaking obligations on each legislator and requires him to share with others full responsibility by word of mouth. This purpose has been announced over and over again by the courts of the country. Nebraska law formerly conformed to these views. Constitutional provisions are mandatory, unless by express provision or necessary implication a different intention is manifest. *Barkley v. Pool,* 102 Neb. 799. There is no provision or implication to the contrary. My research leads me to conclude there is no judicial prece-

dent at variance with these views, except in a few instances, where courts bowed to expediency or convenience and departed from the law.

The Constitution does not automatically develop with changed conditions and new inventions at such a pace and with such power as to sweep down its mandatory provisions without even an attempt at lawful amendment. Mechanism should not be recognized as the master of the Constitution. The general course of precedent is to the effect that laws prescribing the manner in which members of legislative bodies shall vote on proposed legislation is mandatory and that public acts not so adopted are void. *Cutler v. Town of Russellville,* 40 Ark. 105; *Tracey v. People,* 6 Colo. 151; *Rich v. City of Chicago,* 59 Ill. 286; *Spangler v. Jacoby,* 14 Ill. 297; *City of Logansport v. Dykeman,* 116 Ind. 15; *Town of Olin v. Meyers,* 55 Ia. 209; *Morrison v. City of Lawrence,* 98 Mass. 219; *Coffin v. City of Portland,* 43 Fed. 411; *Sullivan v. Pausch,* 5 Ohio Cir. Ct. Rep. 196.

It is perfectly clear to my mind that the meaning of the requirement for voting *viva voce* is definite and certain and not open to construction, but the result would be the same, if a resort to interpretation could be justified. Interpretation of a phrase in a foreign language is controlled by the meaning of the original text, rather than by translation into English words having a broader import. *Engen v. Union State Bank,* 121 Neb. 257; *Todok v. Union State Bank,* 281 U. S. 449. As applied to voting, the Latin words, *"viva voce,"* are technical in an exclusive sense—"With the living voice" or "By word of mouth." Technical words in a law are considered in a technical sense. *Franklin v. Kelley,* 2 Neb. 79.

Literal compliance with voting *viva voce* on the final passage of a bill will not deprive a voiceless statesman of a right to make known his legislative will. Neither the record nor the current history of legislation furnishes an example of a legislator without a voice, but, if one should be found, there will be other legislators to lend

a voice for the purpose of a vote. In such an improbable event the right to vote will be determined by interpretation of the constitutional provision prescribing qualifications for members of the legislature. *Letcher v. Moore,* Cl. & H. Cont. El. Cas. 715.

When this cause was argued at the bar, I assumed it was submitted as a test case for a declaratory judgment of the court on facts pleaded by plaintiff and admitted by defendants. An admitted fact of the record is that house roll 56 was not passed by votes *viva voce.* I now learn that the court has rejected the admitted facts pleaded and has determined the issue by judicial notice of legislative journals. By attempting to pass house roll 56 without complying with the mandatory constitutional provision that "All votes in either house shall be *viva voce,*" an admitted fact, the legislature went beyond a limitation of power fixed by the Constitution and attempted to deprive the state of part of its revenue. I deny the right or power of the legislature to disregard a mandatory provision of the Constitution, to thus deprive the state of lawful revenue, to make legislative journals which do not show compliance with the exclusive constitutional method of individual voting *viva voce* on the final roll call and in this manner to prevent the court from redressing wrongs. In the present instance, however, the legislative journals themselves disclose a method of voting at variance with the Constitution, thus leaving the court free to pass on the question presented in the light of the admitted facts pleaded. The constitutional law of Nebraska is:

"All courts shall be open, and every person, for any injury done him in his lands, goods, person, or reputation, shall have a remedy by due course of law, and justice administered without denial or delay." Const. art. I, sec. 13.

This provision applies to the state as well as to individuals, and is a delusion and a snare, if the legislature can exceed its powers, strip the state of revenue or a citizen of his property in violation of the Constitution

and close the door to judicial scrutiny and redress. The law is that the humblest citizen, when his constitutional rights are invaded by the legislature, stands before the court on an equality with government in all its power. The state and its officers have the same standing. I am reminded of the prophetic vision of Abraham Lincoln who said:

"Let every man remember that to violate the law is to trample on the blood of his father, and to tear the charter of his own and his children's liberty. Let reverence for the laws be breathed by every American mother to the lisping babe that prattles on her lap. Let it be taught in the schools, in seminaries, in colleges. Let it be preached from the pulpit, proclaimed in the legislative halls, and enforced in courts of justice, and, in short, let it become the political religion of the nation; and let the old and the young, the rich and the poor, the grave and the gay of all sexes and tongues and colors and conditions sacrifice unceasingly upon its altar."

It was the same Lincoln who afterwards, when President, kept his mind clear and his face steady during the revolutionary storms in his distracted country and declared in his first inaugural address:

"I shall take care, as the Constitution especially enjoins upon me, that the laws of the Union be faithfully executed in all states."

There is need of the same spirit in all departments of government. The declaratory judgment should uphold individual *viva voce* voting and condemn house roll 56 as void.