## WILLIAMS *v*. STEIN.

ELECTION.—*Constitutional Law.*—*Ballot.*—The second section of the act approved May 13th, 1869, 3 Ind. Stat. 235, requiring "the inspector of any

election, on receiving the ballot of any voter, to have the same numbered with figures, on the outside or back thereof, to correspond with the number placed opposite the name of such voter on the poll lists," is void, it being in conflict with section thirteen of article two, of the constitution of this State, which declares, that " all elections by the people shall be by ballot."

SAME.—By the ballot, the constitution secures to the voter the protection and immunity of secrecy. The ballot implies absolute and inviolable secrecy.

APPEAL from the Tippecanoe Civil Circuit Court.

PETTIT, J.—The following is the opinion of Judge Vinton, before whom the case was tried below, and we approve, adopt, and make it our own, believing it needs no improvement, if we were capable of making any.

The complaint alleges, in substance, that on the 11th day of October, 1870, at a general election held pursuant to law for the election of divers officers, the defendant was the duly appointed inspector of elections for a legal precinct of Fairfield township, in Tippecanoe county, known as precinct No. 2, and officiated as such; that on said day the plaintiff was a resident of said township and a duly qualified voter, etc.; that he gave his ballot, which was in all respects a legal ballot, to said defendant as such inspector, and demanded that it should be put into the ballot-box without any distinguishing mark or number being placed upon it; but that defendant, as such inspector, against the protest of plaintiff, unlawfully numbered the same, etc., whereby plaintiff became damaged in his constitutional privileges and franchises, etc.

The defendant has demurred to the complaint for want of sufficient facts to constitute a cause of action against him. The question raised by this demurrer involves the constitutionality of section 2 of an act of the legislature, approved May 13th, 1869, which section reads in these words, viz.:

"It shall be the duty of the inspector of any election held in this State, on receiving the ballot of any voter, to have the same numbered with figures, on the outside or back thereof, to correspond with the number placed opposite the name of such voter on the poll lists kept by the clerks of said election."

It will be seen that the acts of the defendant, of which plaintiff complains, are not only authorized, but enjoined, by the section quoted; and if the same is valid, there is an end of plaintiff's case. It is claimed, however, that this law is void, because in conflict with section 13 of article 2 of the constitution of Indiana. Section 13 reads thus:

"All elections by the people shall be by ballot; and all elections by the general assembly, or either branch thereof, shall be *viva voce*."

Here are two modes of election provided for and enjoined; the one applicable to the general assembly, the other to all elections by the people. There is no trouble in determining that the *viva voce* method was intended to secure publicity; and the reason for such publicity is equally manifest. Elections by the general assembly must be *viva voce;* and why? Because the members of that body are agents or representatives of their several constituencies, to whom they are responsible for their votes; and to that end they must vote openly and audibly, that it may be known how they are exercising their delegated authority.

No such reason, if indeed there be any, exists as to the voter at a popular election. He represents nobody, and is responsible to nobody for the vote he may cast. He should vote honestly and intelligently, and under our system he is presumed to do so; but he has the absolute right to exercise the franchise as he pleases, uncontrolled and unquestioned by any person or power.

Since the one mode provided by the constitution necessarily involves openness, publicity, does not the other, which is used in distinction with it, necessarily imply privacy, secrecy?

"A ballot may be defined to be a piece of paper, or other suitable material, with the name written or printed upon it of the person to be voted for; and where the suffrages are given in this form, each of the electors, in person, deposits such a vote in a box or other receptacle provided for the

purpose, and kept in the custody of the proper officers."
Cush. Leg. Assemb. sec. 103.

In Bouvier's Dictionary, I find this definition of the term:
"Ballot.    A diminutive ball, *i. e.*, a little ball used in giving
votes; the act itself of giving votes; a little ball or ticket
used in voting privately, and, for that purpose, put into a
box (commonly called a ballot-box) or some other contri-
vance."

According to an article in the New American Encyclopedia,
the "ballot" did not necessarily imply secrecy in Greece;
but in Rome, during the republic, it did.

A very able and instructive paper on the subject of the
ballot is found in the Ency. Britannica.   It may be gathered
from that article that in France and Great Britain the term
"ballot" implies absolute secrecy.

May, in his excellent work on the Constitutional History
of England, thus speaks of the ballot, at p. 353, vol. 1:

"The ballot is another question repeatedly debated in
Parliament, and a popular topic at the hustings, at public
meetings, and in the newspaper press.   No sooner had the
reform act passed, than complaints were made that the elec-
tive franchise, so recently enlarged, could not be freely exer-
cised.   It was said that the landlords in the counties, and
wealthy customers in towns, coerced the free-will of the
electors and forced them to vote against their opinions and
consciences.   As a protection against such *practices*, the
necessity of secret voting was contended for.   To give the
franchise without the means of exercising it, was declared to
be a mockery."

We are also informed by this work, that the right to vote
by ballot was one of the five points of the great "People's
Charter" of 1839.   A petition, signed by 1,230,000 persons,
was presented to the House of Commons, praying the right
to vote by ballot.

The common understanding in this country certainly is,
that the term "ballot" implies secrecy.   I have nowhere
found a *dictum* to the contrary.   The Supreme Court of

Pennsylvania, in a case involving the validity of an election, held, that an eagle printed on the ticket as a party badge, violated a certain by-law, "since it deprived a voter of that secrecy to which he was entitled in the exercise of his franchise, so as to avoid the odium and violence of party prejudice." 3 S. & R. 29.

In the case of the *People* v. *Pease*, 27 N. Y. 45, which was an action in the nature of a *quo warranto*, DENIO, Chief Justice, uses the following language: "I have already alluded to the policy of the law providing for a secret ballot. The right to vote in this manner has usually been considered an important and valuable safeguard of the independence of the *humble citizen* against the influence which wealth and station might be supposed to exercise. This object would be accomplished but very imperfectly, if the privacy supposed to be secured was limited to the moment of depositing the ballot. The spirit of the system requires that the elector should be secured then, and at all times thereafter, against reproach or animadversion, or any other prejudice, on account of having voted according to his own unbiased judgment; and that security is made to consist in shutting up within the privacy of his own mind all knowledge of the manner in which he has bestowed his suffrage."

COOLEY, J., in his recent work on "Constitutional Limitations," discusses this subject. "The mode," says he, "of voting in this country, at all general elections, is almost universally by ballot. The distinguishing feature of this mode of voting is, that every voter is thus enabled to secure and preserve the most complete and inviolable secrecy in regard to the persons for whom he votes, and thus escape the influences which, under the system of oral suffrages, may be brought to bear upon him with a view to overbear and intimidate, and thus prevent the real expression of public sentiment.

"In order to secure as perfectly as possible the benefits anticipated from this system, statutes have been passed, in some of the States, which prohibit ballots being received or counted unless the same are written or printed upon white

paper, without any marks or figures thereon intended to distinguish one ballot from another. These statutes are simply declaratory of a constitutional principle that inheres in the system of voting by ballot, and which ought to be inviolable whether declared or not. In the absence of such a statute, all devices by which party managers are enabled to distinguish ballots in the hand of the voter, and thus determine whether he is voting for or against them, are opposed to the spirit of the constitution, inasmuch as they tend to defeat the design for which voting by ballot is established.

"The courts have held that a voter, even in case of a contested election, cannot be compelled to disclose for whom he voted. Public policy requires that the veil of secrecy should be impenetrable, unless the voter himself voluntarily determines to lift it; his ballot is absolutely privileged; and to allow evidence of its contents, when he has not waived the privilege, is to encourage trickery and fraud, and would, in effect, establish this remarkable anomaly, that, while the law from motives of public policy establishes the secret ballot with a view to conceal the elector's action, it at the same time encourages a system of espionage, by means of which the veil of secrecy may be penetrated and the voter's action disclosed to the public." Cooley's Const. Lim. 604; 16 Mich. 283; 27 N. Y. 81.

The question has also undergone investigation in the Supreme Court of Vermont. In *Temple* v. *Mead*, 4 Vt. 535, the court say: "In this country, and indeed in every country where officers are elective, different modes have been adopted for the electors to signify their choice. The most common modes have been, either by voting *viva voce*, that is, by the elector openly naming the person he designates for the office, or by ballot. * * * The principal object of this last mode, is to enable the elector to express his opinion secretly, without being subject to be overawed, or to any ill will or persecution on account of his vote for either of the candidates who may be before the public."

It is believed that these authorities establish, beyond doubt, that the ballot implies absolute and inviolable secrecy, and that the principle is founded in the highest considerations of public policy.

When our present constitution was framed, voting by ballot was in vogue in nearly every state in the union. That mode of voting had been known and well understood for centuries. The term ballot, as designating a mode of election, was then well ascertained and clearly defined. The eminent framers of the constitution certainly employed this term with a full knowledge of its meaning. Many of the most distinguished members of the constitutional convention of 1850 were members of the legislature of 1852, the first that met under the present constitution. That they regarded the ballot system as securing inviolable secrecy, is clearly shown by the following law which they then helped to enact:

"If any judge, inspector, clerk or other officer of an election, shall open or mark, by folding or otherwise, any ticket presented by such elector at such elections, or attempt to find out the names thereon, or suffer the same to be done by any other person, before such ticket is deposited in the ballot-box, he shall be fined in any sum not exceeding one hundred dollars." 2 G. & H. 473, sec. 60.

If the constitution secures to the voter, in popular elections, the protection and immunity of secrecy, there can be no doubt that section 2 of the act of 1869, which authorized the inspector to number ballots, is clearly in conflict with it and is void.

I am not unmindful of the rule that all doubts are to be solved in favor of the constitutionality of legislative enactments. This rule is well established and is founded in the highest wisdom. But my convictions are clear that our constitution was intended to, and does, secure the absolute secrecy of a ballot, and that the act in question, which directs the numbering of tickets, to correspond with the numbers opposite the names of the electors on the poll lists,

is in palpable conflict not only with the spirit, but with the substance of the constitutional provision.

This act was intended to, and does, clearly identify every man's ticket, and renders it easy to ascertain exactly how any particular person voted. That secrecy which is esteemed by all authority to be essential to the free exercise of suffrage, is as much violated by this law as if it had declared that the election should be *viva voce.*

We add one authority, Wharton's Law Dictionary:

"Ballot. To vote for or choose a person into an office by means of little balls of several colors, which are put into a box privately, according to the *inclination* of the chooser or voter; or by writing the name or names of the candidates upon small pieces of paper and rolling them up, so that they cannot be read, which are put into a box; and when the time limited for the election is over, an indifferent person takes them out one by one, and upon reading the name or names, somebody takes down the number of votes, the greater of which is declared duly elected."

The demurrer was overruled, and exception taken. The appellant refused to answer over, and the cause was submitted to the court for trial. Finding and judgment for the plaintiff for one hundred and fifty dollars. The only error assigned is the overruling of the demurrer to the complaint. This was not error.

The judgment is affirmed, at the costs of the appellant.

*J. S. Williams* and *W. C. Wilson,* for appellant.

*J. A. Stein, J. R. Coffroth, T. B. Ward, G. O. Behm,* and *A. O. Behm,* for appellee.