CITY OF DETROIT *v.* BOARD OF INSPECTORS OF ELECTION FOR THE FOURTH ELECTION DISTRICT OF THE SECOND WARD OF THE CITY OF DETROIT.

ELECTIONS—USE OF VOTING MACHINE—CONSTITUTIONALITY.

Section 2 of article 7 of the Constitution, requiring all votes, except for township officers, to be given by ballot, merely declares the policy of the State to assure to the elector a secret, as distinguished from an open, or announced, vote, and does not permanently establish a particular mode of voting, and is not infringed by Act No. 234, Pub. Acts 1903, amending sections 3750–3758, 1 Comp. Laws, authorizing the use of voting machines, and requiring all voting by machine to be by a secret vote.

Certiorari to Wayne; Mandell, J. Submitted March 28, 1905. (Calendar No. 21,035.) Decided March 30, 1905.

Mandamus by the city of Detroit to compel the board of inspectors of election for the Fourth election district of the Second ward of the city of Detroit to use certain voting machines. There was an order denying the writ, and relator brings certiorari. Reversed.

*Timothy E. Tarsney*, Corporation Counsel ( *Lewis A. Stoneman* and *Frank Keiper*, of counsel ), for relator.

*Sherman D. Callender*, for respondents.

OSTRANDER, J.   The relator, the city of Detroit, filed its petition in the circuit court for the county of Wayne, setting out, in substance, the following facts:   That at a meeting of the common council of the city of Detroit held March 7, 1905, the city clerk was directed by resolution to have voting machines placed in divers election districts in said city ( amongst others, in the Fourth district of the Second ward ), to be used at the election to be held Monday, April 3, 1905; that the resolution specified a particular kind of voting machine; that the board of inspectors of the named district, and each of them, have refused to obey the order of the common council, and assert that they will not obey it, giving as reason for their refusal that such method of voting is not a constitutional method. It is further set out that the particular voting machine is a complete and perfect piece of mechanism, thoroughly tested and reliable, constructed and operated in such a way as to permit an elector to vote secretly for a candidate or candidates of his choice upon any and all tickets, and that the same opportunity for discrimination is provided for the elector as if a paper ticket were used.   The petition prays for a writ of mandamus, directed to the board of inspectors of said election district, commanding them to obey the resolution of the council.   An order to show cause was issued, and the inspectors of said election district filed an answer, in which they admit the facts stated and set forth in the petition of relator, and they aver that they have refused and will refuse to obey the said order and direction of the common council to use the voting machine named, or any other voting machine, because they are advised that, under and by virtue of the provisions of section 2 of article 7 of the Constitution of this State, all votes given at any election must be by bal-

lot, except as stated in said Constitution, "and that the word 'ballot,' as contained in said provision of the Constitution, does not permit the use of said voting machines, or any other voting machine, at elections, but means only a ticket upon which shall be written or printed the names of the candidates to be voted for at said election, and that the use of any other device is without warrant or authority of law." The cause coming on to be heard upon the petition and answer, the court denied the writ. The proceeding is brought into this court by certiorari, has been argued orally, and very full briefs have been submitted in behalf of both the relator and the respondents.

The act of the legislature which is brought into question is Act No. 61, Pub. Acts 1897, 1 Comp. Laws, §§ 3750–3758, as amended by Act No. 234 of the Public Acts of 1903. The title of the act is, "An act to authorize the use of any thoroughly tested and reliable voting machine at any election held in this State." The act provides that any city council or village council may at any regular meeting authorize the use of such voting machines at any election to be held within their respective cities or incorporated villages during the ensuing year, but that "all voting by machines shall be a secret vote as hereinafter provided," and that all election laws not incompatible with the act are continued in full force and effect.

The pleadings before us, read in connection with the legislation referred to, not only assume but afford assurance of the fact, that the voting machines in question will, if used, insure to the elector proper instruction in the use of the machines, absolute secrecy in voting, opportunity to vote for any person or candidate of his choice for any office to be filled at a particular election, a knowledge that he has voted, a correct record of the vote or votes, and a public and correct declaration of the total result of the election, and the recording and preservation of such result by officers chosen and sworn for that purpose.

It is with reference to this statement of facts, and upon the assumption of the verity of each of them, that we pro-

ceed to discuss the only question before us, which is, Does the legislation in question contravene the provisions of section 2 of article 7 of the Constitution? That section reads:

"All votes shall be given by ballot, except for such township officers as may be authorized by law to be otherwise chosen."

The same language was used in the Constitution of 1835, art. 2, § 2.

There is but one other provision of the Constitution relating to the method of voting at elections, and that is section 11 of article 4, which is:

"In all elections by either house or in joint convention, the vote shall be given viva voce."

The question may be stated in simpler form in this way: Is a vote given or cast by the use of the machine—secrecy, free choice of candidates, a correct record of the vote, and a correct record and announcement of the total vote given for each candidate being assured—a vote "given by ballot?"

All reasonable presumptions are to be indulged to support the questioned legislation. The Constitution of Michigan is not a Code, nor is the particular provision in any way self-executing. The language is imperative, and requires that whatever system of conducting elections shall receive legislative sanction must have, as an integral, mandatory part of it, voting by ballot. In our opinion, the question is not to be determined as one of mere philology; nor should we apply, as we are asked to do, the rule of construction, often of great assistance, which limits the meaning of the words "given by ballot" to the vehicle used in voting or the method of depositing the vote which was probably in the contemplation of the framers of the Constitution. Neither do we regard as controlling the fact that previous legislative enactments have, with few exceptions, and those like the one now before us, uniformly provided for written or printed tickets for use in elections.

We may assume that they have adopted the best known and most convenient way of voting by ballot—of obeying the constitutional mandate. And a ticket so provided was not a ballot, but, when properly deposited, or properly marked and deposited, by the elector, was a vote given by ballot. *State, ex rel. Runge,* v. *Anderson,* 100 Wis. 523, 531 (42 L. R. A. 239).

We regard the provision of the Constitution as a declaration of State policy, assuring to the elector a secret, as distinguished from an open or announced, vote. And in reaching this conclusion, we apply those rules of construction which observe the apparent purpose of the provision questioned; its generality; whether the language used is broader in meaning than the individual conceptions at the time of its adoption, and broad enough to sustain the legislation now considered.

The necessity for an early opinion in this case prevents any considerable references to the history of voting by ballot. The uses of the white and black balls in the club and in the lodge are familiar. Some of the early laws of the colonies provided that freemen might vote in the affirmative by the use of an Indian corn; in the negative, by putting in a bean. Lexicographers seem not agreed upon the derivation of the word "ballot." It has been said that it was adopted from the French language, without change of meaning (*State* v. *Shaw,* 9 S. C. 94, 138); that it comes from the Greek word meaning "to throw" (2 Am. Cyc. 540). In common speech, the word "ballot" is used to mean the ball or ticket used in voting; the act of voting; the result of voting. It seems clear, however, that from the earliest times voting by ballot has been a term used to contradistinguish open, viva voce, or public voting, and secret voting.

"Voting by ballots is by a ticket or ball, and secrecy is an essential part of this manner of voting." 1 Bouvier Law Dict. (Rawle's Rev.) tit. "Election," subd. "Ballots."

"The material guaranty of the provision of the constitution (section 6, art. 6), that 'all elections by the people

shall be by ballot' is inviolable secrecy as to the person for whom an elector shall vote; and this guaranty is binding upon municipal governments in their regulation of elections." *State, ex rel. Smith,* v. *Anderson,* 26 Fla. 240, syllabus.

"The expression 'election by ballots' had been expounded and construed by the various courts of last resort, and, with entire unanimity, they had declared it meant a *secret* ballot, and that the essential principle of this manner of voting was that the elector might conceal from every person the name of the candidate for whom he voted." *Ex parte Arnold,* 128 Mo. 261 (33 L. R. A. 386).

See, also, *Williams* v. *Stein,* 38 Ind. 89; *Ritchie* v. *Richards,* 14 Utah, 345; *Brisbin* v. *Cleary,* 26 Minn. 107. References to the principal lexicographers will discover the same concept and definitions of ballot voting.

In *Opinion of the Judges,* 7 Me. 495, one of the questions answered was whether printed ballots came within the meaning of a constitutional provision which required that all elections shall be by written ballots. The answer was, in part:

"It may be observed that those who framed the constitution undoubtedly intended to guard against many inconveniences in the before-named elections, by excluding all those other modes by which questions are often decided in popular assemblies. This was the general object. The word 'ballot' may be considered as opposed to a vote by word or by signs—as, for instance, a vote by yeas and nays, or the common mode of voting, by holding up the hand, or by rising and standing till counted. It may well be supposed that the mode prescribed was preferred * * * because it secures a greater degree of independence than any other in the exercise of the elective franchise."

And the printed ballot was held good.

*Henshaw* v. *Foster,* 9 Pick. (Mass.) 312, 320, is as to the question presented, like the case last cited, and to that question the same answer was returned. But the opinion is of further interest here. It was urged "that the uniform and constant use of manuscript ballots in elections amounts to a construction of the terms of the constitution which ought

now to be received as the only true one." Of this the court, speaking by Chief Justice Parker, said:

" This practice of a mode of voting which is undoubtedly constitutional, founded in existing convenience, and never brought into competition with the use of printed votes, scarcely furnishes an argument against the latter. * * * It merely shows a preference of one over the other, or that one during the time of the practice is more convenient than the other."

To the same effect is *Temple* v. *Mead,* 4 Vt. 535.

In the opinions and briefs in *State* v. *Shaw,* 9 S. C. 94, will be found an exhaustive discussion of the meaning of the word " ballot," its derivation and definitions, some history of its employment, and its meaning, as used in the constitution of that State. That constitution provided that " in all elections by the general assembly, or either house thereof, the members shall vote viva voce and their votes thus given shall be entered upon the journal of the house to which they respectively belong." Another section of the same instrument required the State to be divided into convenient circuits, and that for each the assembly should elect a judge by " joint ballot." In the election of certain judges, the vote was given viva voce; and upon application of the attorney general, who invoked the original jurisdiction of the supreme court of the State, and who contended that a secret ballot was by the constitution made imperative in such elections, there was a judgment of ouster.

The case, *In re Voting Machine,* 19 R. I. 729 (36 L. R. A. 547), is not precisely in point here, because of differences in the constitutional provisions of the two States. The opinion is of interest, however, because the court considered the argument that the framers of the constitution, as individuals, never had in mind such a method of voting. Of this it is said:

" The question, however, is not what limitations they may have had in mind, by reason of the methods to which they were accustomed, but what the language of the con-

stitution means, or may reasonably mean, with reference to the matter before us.   *   *   *"

In *Opinion of the Justices to the House of Representatives*, 178 Mass. 605 (54 L. R. A. 430), the question presented was:

' "Has the general court the right to authorize the use of voting and counting machines at elections by the people of national, State, district, county, city, or town officers?"

The constitution, as has been noticed, provided that representatives shall be chosen by written vote.   It was held by three of the justices that the requirement might be complied with in voting by a machine which registers each vote cast without the use of separate ballots.   One justice concurred, provided the results of the action of the machine in registering each vote were visible to the voter, and the work of the machine in adding up votes was done under the supervision of some person or persons charged with the duty of counting the votes cast.   Three justices dissented upon the ground that "the turn of a wheel or dial punching a hole in an unseen roll of paper on which are the names of candidates, by a voter who pulls a lever or turns a key, is not a written vote, within the meaning of the constitution."   The majority opinion, which seems to have been prepared by Chief Justice Holmes, referring to the opinion in *Henshaw* v. *Foster*, 9 Pick. (Mass.) 312, in which it was said that the word "ballot" is ambiguous, which was the reason for the constitutional requirement of a written vote, contains this language:

"No doubt, the picture in the minds of those who used the words was that of a piece of paper with the names of the candidates voted for written upon it in manuscript; but the thing which they meant to stop was oral or hand voting, and the benefits which they meant to secure were the greater certainty and permanence of a material record of each voter's act, and the relative privacy incident to doing that act in silence   *   *   *   It seems to us that the object and even the words of the constitution, in requiring 'written votes,' are satisfied when the voter makes a

change in a material object—for instance, by causing a wheel to revolve a fixed distance—if the material object changed is so connected with or related to a written or printed name purporting to be the name of a candidate for office that, by the understanding of all, the making of the change expresses a vote for the candidate whose name is thus connected with the device."

Our attention has been called to no decisions precisely in point. We have referred to those mentioned as supporting substantially our reasoning and the result arrived at. We do not regard the decision in *State, ex rel. Runge,* v. *Anderson,* 100 Wis. 523 (42 L. R. A. 239), as opposed in principle to either our reasoning or conclusions.

The purpose of the framers of our Constitution in requiring that in all elections in either house of the legislature the votes shall be given viva voce is obvious. Equally obvious, in our opinion, is the purpose of the provision under consideration. It is undoubted, as is claimed by counsel for respondents, that as early as 1835 the method of voting by the use of tickets was known. It was nevertheless important that the policy of the new State with reference to the subject of voting at elections should be declared in the Constitution. Agitation for the vote by ballot had only then begun in England, nor was it ended and the ballot assured until 1872. In 1835, and after, voting other than by ballot was practiced in the United States. To say that the purpose of the framers of our Constitution was not to secure a particular mode of voting secretly, but was to make manifest in the organic and continuing law a policy to be perpetuated, is to give to the words of the instrument no forced or unnatural meaning.

As was said by Mr. Justice CAMPBELL in *People* v. *Cicott,* 16 Mich. 283, 297.

" Our whole ballot system is based upon the idea that, unless inviolable secrecy is preserved concerning every voter's action, there can be no safety against those personal or political influences which destroy individual freedom of choice. "

If we could imagine our Constitution adopted today, and the legislation in question enacted, with reference to all the facts stated, tomorrow, would it be contended that the legislation was unconstitutional because not providing that "votes shall be given by ballot?"

We are of opinion that we should not hold the legislation to be invalid for any of the reasons urged. The circuit court for the county of Wayne was in error in denying the writ of mandamus, which should issue as prayed.

The proceeding being one of public interest and importance, no costs will be awarded.

MOORE, C. J., and CARPENTER, MCALVAY, GRANT, BLAIR, MONTGOMERY, and HOOKER, JJ., concurred.