## SPICKERMAN ET AL. *v.* GODDARD ET AL.

[No. 22,665. Filed December 10, 1914.]

1. CONSTITUTIONAL LAW.—*Elections.—Voting Machines.—"Ballot"*. —The Constitution was designed for practical use, and not as a rigid mould to fetter the growth and development of the State, and, in view of the objects sought to be attained thereby, it can not be deemed that its framers intended that the word "ballot" in §13 of Art. 2, providing that all elections by the people shall be by ballot, should be confined to a written or printed ticket prepared or adopted by the voter and cast by him as the expression of his choice, but that they intended thereby to preserve secrecy; hence the use of voting machines, provided by the county commissioners under authority of §7021 *et seq.* Burns 1914, Acts 1901 p. 591, does not render an election void as not being by ballot. p. 525.

2. INTOXICATING LIQUORS.—*Local Option Election.—Voting Machines.*—Section 4 of the Proctor Act (Acts 1911 p. 363, §8319 Burns 1914) providing a form of ballot to be voted at local option elections, when considered with §10 thereof (§8323b Burns 1914) providing that the general election laws of the State shall apply as far as the same are applicable, and §1 (§8316 Burns 1914) providing for the places of holding elections, does not prevent the use of voting machines, and a local option election in which they are used is valid. p. 528.

3. INTOXICATING LIQUORS.—*Local Option Election.—Voting Machines.*—Where voting machines were used in a local option election, and it appeared that there was a difference of 497 between the poll list of voters who entered the booths and the number of votes cast, and that the machines in use were in no way defective, it must be presumed that such number intentionally refrained from voting, or through ignorance failed to adjust the registering key so as to register their intentions. p. 531.

4. INTOXICATING LIQUORS.—*Local Option Election.—"Majority"*.— Under the provisions of §7 of the Proctor Act (Acts 1911 p. 363, §8322 Burns 1914) the determination of the result of a local option election depends upon a "majority of the legal votes cast",

so that where voting machines were used, which were not defective and registered properly, and there was a difference of 497 between the poll list number of voters who entered the booths and the number of votes registered by the machines, the 497 should not be considered in determining the majority, since it must be assumed that either by wilfully refraining, or through ignorance in operating the machines, that number failed to cast legal votes. p. 533.

From Delaware Circuit Court; *Frank Ellis*, Judge.

Action by Henry R. Spickerman and others against Joseph A. Goddard and others, contesting a local option election. From a judgment declaring the election legal and declaring a majority in favor of prohibition, the contestants appeal. *Affirmed.*

*George Shirts, William F. White* and *William T. Haymond,* for appellants.

*R. C. Minton, Joseph G. Leffler, Warner & Warner* and *McClellan, Hensel & Guthrie,* for appellees.

MORRIS, J.—Appellees filed a petition for a local option election in the city of Muncie under the provisions of the act of 1911, commonly called the Proctor Law. Acts 1911 p. 363, §§8316-8323c Burns 1914. An election was held March 9, 1914. The return of the canvassing board showed that a majority of the legal votes cast favored prohibition of the sale of intoxicating liquors in the city. Appellants challenged the correctness of the return, and filed remonstrances. There was a hearing before the board of commissioners, which entered a judgment declaring the election legal, and that a majority of the legal votes cast favored prohibition. Appellants then appealed to the circuit court. A trial there resulted in a like judgment.

At the election in question voting machines were used. They were purchased in 1906 by the county commissioners under the law of 1901. Acts 1901 p. 591, §7021 *et seq.* Burns 1914. When the machines were purchased the precinct boundaries in Muncie were established so as to in-

clude, in each, approximately 600 voters. These boundaries were never changed, and the machines had been used at all elections held since their purchase.

Appellants contend that our statute which authorizes the use of voting machines in elections by the people is void because in conflict with §13 of Art. 2 of the Constitution of Indiana which provides that "All elections by the people shall be by ballot; and all elections by the general assembly, or by either branch thereof, shall be *viva voce.*" It is contended that when the Constitution was adopted (1851) the meaning of the word ballot was plain and well understood, and the word as used meant "a printed or written expression of the voter's choice upon some material capable of receiving and reasonably retaining it, prepared or adopted by each individual voter, and passing by the act of voting from his exclusive control into that of the election officers, to be by them accepted as the expression of his choice." *State, ex rel.* v. *Board, etc.* (1909), 80 Ohio St. 471, 89 N. E. 33, 24 L. R. A. (N. S.) 188. The constitutionality of acts authorizing the use of voting machines has been determined by various American courts, and generally they have been upheld. The machines have been in use in portions of this State for so long a period that we would not be inclined to consider at length the reasons urged against the law, were it not that the supreme judicial court of Massachusetts, in *Nichols* v. *Board, etc.* (1907), 196 Mass. 410, 82 N. E. 50, 124 Am. St. 568, 12 L. R. A. (N. S.) 280, held their use in conflict with the constitution of that state, which provides that certain officers shall be "chosen by written votes; and further, that the supreme court of Ohio, in *State, ex rel.* v. *Board, etc., supra,* has decided that the use of voting machines is prohibited by a constitutional provision that "all elections shall be by ballot".

The purpose of the framers of a constitutional provision must be sought, and given effect, if found. Our organic law was framed to better secure to the people of the State

their right to life, liberty and the enjoyment of the fruits of their industry. It was designed for the use of common practical people while pursuing their varied occupations, and not as a rigid mould to fetter their growth and development. It was written by statesmen, selected for their wisdom, while in convention assembled, and was designed for practical use rather than as a declaration of abstract principles. In seeking its purposes, it must be viewed from the standpoint of the statesmen who formulated it, rather than that of lexicographers and philologists who neither participated in the work nor considered its provisions. Story, Constitution §§400, 454; *Moore-Mansfield, etc., Co.* v. *Indianapolis, etc., R. Co.* (1913), 179 Ind. 356, 101 N. E. 296, 44 L. R. A. (N. S.) 816; *Elwell* v. *Comstock* (1906), 99 Minn. 261, 109 N. W. 698, 7 L. R. A. (N. S.) 621, 9 Ann. Cas. 270; *Detroit* v. *Board, etc.* (1905), 139 Mich. 548, 102 N. W. 1029, 111 Am. St. 430, 69 L. R. A. 184, 5 Ann. Cas. 861. It is important that the end sought by the framers of this constitutional provision be not confounded with the means adapted to secure it. The object the framers had in view was *secrecy* in the people's choosing of officers or measures, and *publicity* in choosing by the members of the General Assembly. *Williams* v. *Stein* (1871), 38 Ind. 89, 10 Am. Rep. 97. Voting by ballot involves secrecy while *viva voce* voting insures publicity. The word "ballot" was used as a symbol of secrecy while *viva voce* was used as the symbol of publicity. There was nothing sacred in the contrivance of a strip of paper with names or questions printed thereon, which the framers sought, to preserve by the use of the word "ballot"; nor was there any imperative necessity for the use of the voice of the legislator which moved the convention to decree its perpetual exercise in legislative elections. The constitutional limitation is not violated by dispensing with the use of the paper contrivance in the one case, or the legislator's natural voice in the other, if, in the former the people may choose in secret, and in the latter the legislator

must make a public expression of his choice. *Williams* v. *Stein, supra.* It can scarcely be doubted, unless resort be had to technical quibbles, that the constitutional mandate would be satisfied by the legislator publicly raising his right hand to express his choice in a legislative election, instead of using his voice for such purpose.

Our Constitution (Art. 7, §5) requires the opinions of this court to be given "in writing". At the time of the convention, the opinions were delivered in the handwriting of the judges, with pen or quill as the mechanical device used. The object of course was not to preserve the mere handwriting of the judges, but to provide a permanent record of the court's reasons for its mandates. An opinion as then written could be filed as a permanent record, and consequently the word "writing" was used to symbolize the purpose of requiring a permanent record. In recent years the court's opinions have been printed on typewriting machines, and thereby the inconvenience resulting from poor handwriting has been eliminated, and no one has been no narrowly technical as to claim the Constitution has been violated by the innovation.

Of course the framers of our Constitution knew nothing of voting machines; nor did they of the Australian ballot. Neither did they dream of the telephone or electric railway. They must have contemplated the use of new inventions, for during their own lives the industries of the State were greatly modified by railroad construction, and the electric telegraph had arrived. Because they did not know of telephones or electric railways would furnish no argument for their escape from taxation, nor for burdening them with an unequal rate of assessment, in the absence of a constitutional amendment. In reading the debates of the convention which framed our Constitution, one must be impressed with the fact that the members of that body not only contemplated the marvelous growth and progress of the State that have taken place, but, in some respects, anticipated even a greater

development.   That they did not deem it necessary to amend the Constitution to meet the requirements of changing industries and increasing and shifting populations occasioned by new inventions or the broadened use of old ones, is evidenced by the fact that they made provision for amendment only after approval by two sessions of the General Assembly.

The structure of our organic law is sufficiently capacious to meet the requirements of any changes in the election laws designed to prevent fraud or promote a nearer approach to absolute secrecy in voting.   That such was the purpose of the 1901 act authorizing the use of machine voting is apparent, and we hold it not violative of the constitutional provision in question.   *Lynch* v. *Malley* (1905), 215 Ill. 574, 74 N. E: 723, 2 Ann. Cas. 837; *Elwell* v. *Comstock, supra; Detroit* v. *Board, etc., supra; In re Voting Machine* (1897), 19 R. I. 729, 36 Atl. 716, 36 L. R. A. 547; *United States, etc., Mach. Co.* v. *Hobson* (1906), 132 Iowa 38, 109 N. W. 458, 7 L. R. A. (N. S.) 512, 119 Am. St. 539, 10 Ann. Cas. 972.

It is contended that, conceding the constitutionality of the voting machine law; nevertheless the election in question was void because the Proctor Act, by necessary

2.   implication, excludes the use of voting machines in elections held under its provisions.   Section 4 of the act reads as follows:   "The ballot in a special election held under the provisions of this act shall be in the following form:   Shall the sale of intoxicating liquors as a beverage be prohibited in (here inserting the particular territory in which such election is held)?   All ballots marked with a cross in the square containing the word 'yes' shall be counted in favor of prohibiting the sale of intoxicating liquors as a beverage in such territory, and all ballots marked with a cross in the square containing the word 'no' shall be counted opposed to prohibiting such sale therein."   §8319 Burns 1914, Acts 1911 p. 363.   Section 10 of the act contains the

following provision: "In all elections hereunder, and in all matters and proceedings not herein otherwise specified, all the provisions, including penalties, of the general election laws of the state shall apply as far as the same are applicable." §8323b Burns 1914, Acts 1911 p. 363. Section 1 (§8316 Burns 1914, *supra*) of the act provides for holding local option elections in any incorporated city, in any township not containing an incorporated city, and the territory in any township exclusive of that occupied by such city. The section further provides that "Such election shall be held at the usual places for holding general elections."

The Australian ballot act was passed in 1889. Acts 1889 p. 157. Section 1 of the act, as amended in 1907, provides that each precinct shall contain, approximately, 250 voters, but this limitation is not applicable to counties where voting machines may be in use. Acts 1907 p. 659, §6882 Burns 1914.

Section 4 of the voting machine act of 1901, as amended, provides that in counties containing a city of 36,000 population, or more, the county commissioners *shall*, and in other counties *may*, procure voting machines, meeting the requirements of the act, for use in the various precincts of the county. The same section further provides that precincts where voting machines are used shall contain, approximately, 600 voters. Acts 1903 p. 278, §7024 Burns 1914. Section 3 of the voting machine act (Acts 1901 p. 591, §7023 Burns 1914), requires that voting machines must be provided with seven pairs of "yes" and "no" counters, "with the operating or voting devices therefor." Section 8 (Acts 1901 p. 591, §7030 Burns 1914) relating to ballot labels, provides for printing thereon, a statement of a proposed constitutional amendment, "or other question or proposition to be voted on." Section 12 (Acts 1901 p. 591, §7035 Burns 1914) relating to the announcement of the result by the inspector,

provides that "he shall also in the same manner announce the vote on each constitutional amendment, *proposition or other question voted on."*

It is apparent that the voting machines provided for by the statute are adapted to the use by electors in voting on the question of prohibiting the sale of intoxicating liquors in the territory contemplated by the Proctor Act, and nothing in the construction of the machines renders their use inapplicable to local option elections. Does the language of §4 of the Proctor Act denote a legislative intention to exclude such use? Appellants contend that the use of the word "ballot", of itself, as found in that section, indicates that the legislators had in mind the paper ballot therein described, and, by the use of that word, intended to distinguish between a vote cast by such ballot and one that might be cast on a voting machine. We cannot concur in such view. It is unnecessary to repeat what has been said about the word "ballot" as found in our Constitution. The same reasoning in the main, is applicable here. When the act was passed in 1911, the members of the General Assembly knew (because it was a matter of common knowledge) that in a great number of the counties of the State voting machines were not in use and in such counties voting was done under the provisions of the Australian ballot act. In such counties it was necessary to make provision for a form of ballot that would be applicable to the Australian act, or make independent provision for ascertaining the will of the voters. The form of the ballot prescribed by §4, *supra,* was adaptable to use under the general provisions of the Australian ballot law, and, as the voting machines were adapted for the use of ascertaining the will of the electors, nothing more was required than to provide for the application of the general election laws to elections under the Proctor Act. Indeed, without such provision, it is probable that such intent would have been implied, for in the absence of an express intent to the contrary, it would be fairly presum-

able that the General Assembly did not intend to burden the taxpayers of territory where voting machines were ready for service with the needless extra expense occasioned by dispensing with their use; particularly so, when it must be remembered that the justification for the great expense incurred by counties in purchasing such machines was the assumed fact that their use would not only prevent fraud and further safeguard the secrecy of the ballot, but that the machines would soon pay for themselves by reducing the number of election boards.   The use of voting machines was lawful.

3,393 "Yes" and 2,931 "No" votes were cast.   The names of 6,821 voters were entered on the poll lists, making a difference of 497 between the poll list number and the number of votes cast.   The election commissioners canvassed the returns, and certified that "Yes" had a majority of 462 votes.   The certificate contains a tabulation, by precincts, under the following headings: "Precinct No., Yes, No, Unaccounted, Total."   Under the heading "unaccounted" was placed the number representing the difference between the total number of names on the poll lists in each precinct and the total number of yes and no votes cast.   In each precinct there was an "unaccounted" number, ranging from 13 in the sixth to 72 in the eighth. The evidence shows that all the 6,821 persons whose names appear on the poll lists went behind the machine and into the voting booth, and operated the lever; when the voters came out most of them said they had voted; "lots of men" did not respond to the question put by the clerk, asking them if they had voted, but in all cases the clerk announced "voted" when the voter passed out and the word "voted" was written after his name on the poll list.   No voter demanded a ballot, though there were ballots at each precinct, designed for use if the machine failed to work.

The machines in controversy are known as the Columbian machines.   As shown by the evidence the method of their

operation is as follows: The end of a lever extends to the back of each voting machine; as the voter goes in he raises this lever and turns it over until the end extends toward the front; he then steps behind the steel end of the machine, and, to vote, turns a vote-registering key to a perpendicular position; he then comes out, turning the lever over with him, and leaves it in the position he found it; this turning of the lever turns down the voting key he left standing, and registers the vote. If the voter turns the key to a perpendicular, and then turns it down, before turning over the lever, no vote is registered; if he fails to raise the key to the proper position, no vote is registered. He may turn the lever, go behind the machine, turn the lever back and come out, without attempting to vote. Another device registers the number of voters passing behind the machine, but this has no connection with the vote registering device. No one but the voter can know whether he attempts to vote. The machines were all inspected the day before the election, and found in proper working order, and were in like condition when the polls opened. There is no direct evidence that any machine failed in any particular to perform its proper function during the day of the election, and the trial court was warranted in finding that the discrepancy between the number of votes cast, and the number of voters who passed behind the machines was not caused by any defect in the machines or work thereof. It is well known that frequently when questions are submitted at elections, a large percentage of the electors who enter the voting booths fail or refuse to cast any vote on such questions. At the last general election thousands of voters who were given ballots on which to vote for or against the calling of a constitutional convention failed to vote on the question. We have no compulsory voting laws in Indiana, and the only rational inference to be drawn from the evidence here is that 497 voters intentionally refrained from voting, or through ignorance of the working

of the machines failed to so adjust the voting key as to register their intentions.

It is finally contended by appellants that in determining the vote basis the 497 "unaccounted" voters must be considered, in which event the 3,393 "yes" votes did not constitute a majority. In support of this proposition, they cite *In re Denny* (1901), 156 Ind. 104, 124, 59 N. E. 359, 51 L. R. A. 722, and a number of cases from other states. Section 7 (Acts 1911 p. 363, §8322 Burns 1914) of the Proctor Act provides that *"If a majority of the legal votes cast* at said election shall be in favor of prohibiting the sale of intoxicating liquors as a beverage in the territory * * * , it shall thereafter be unlawful for said commissioners or any court to grant a license * * * and the board * * * thereafter shall have no power * * * to hear * * * applications for license * * * in such territory until at a subsequent election * * * *a majority of the legal voters * * * voting at such subsequent election shall vote against prohibiting the sale"* etc. (Italics ours.) The first clause we have italicized also appears in §8 (Acts 1911 p. 363, §8323 Burns 1914), in describing "dry" territory, and in §9 (Acts 1911 p. 363, §8323a Burns 1914), in describing "wet" territory. Appellants claim that a different rule for determining the result was not intended to apply to the two elections contemplated by §7, *supra,* and a reasonable construction of the entire section must result in concluding that it was intended that the majority contemplated is a majority of the electors taking part in the election. We cannot concur in this conclusion. While we are of the opinion that the same rule applies to the determination of the result of all elections held under the act, we are also of the opinion, on a consideration of all the provisions of §§7, 8 and 9, *supra,* that the basis intended was the number of all the legal votes cast.

In the case of *In re Denny, supra,* this court held that

under §1, Art. 16 of our Constitution, which requires a constitutional amendment to be ratified by a majority of the "electors of the state," a proposed amendment submitted at a general election at which more than 650,000 votes were cast for governor, and only 240,031 were cast for the amendment, that it failed of ratification, though only 144,072 votes were cast against it. The same doctrine was declared in *State* v. *Swift* (1880), 69 Ind. 505, and re-affirmed in the case of *In re Boswell* (1913), 179 Ind. 292, 100 N. E. 833. In view of the language used in Art. 16, §1 of our Constitution, it might seem strange that the intent of the provision was, ever considered doubtful, but we fail to see how these decisions have any just application to the provision in controversy here, viz., "a majority of the legal votes cast." Appellants cite *Loden* v. *City of Warren* (1912), 118 Minn. 371, 136 N. W. 1031, which was decided under a statute which forbade the granting of license unless, at the election in controversy, a "majority of the votes cast", favored such granting. At the election, 321 ballots were cast. Of these, 154 favored, and 149 opposed the granting of license, while 17 blank ballots were deposited and one was not intelligibly marked. It was held that the proposition for license failed. Blank ballots and the unintelligible one were considered as a part of the aggregate.

Appellees cite *State* v. *Clausen* (1913), 72 Wash. 409, 130 Pac. 479, 45 L. R. A. (N. S.) 714, which held that under a statute requiring a proposition to issue bonds to be ratified by "three-fifths of the qualified voters of the said city", ballots rejected as unintelligible or illegal should not be counted in determining the aggregate. In *City of South Bend* v. *Lewis* (1894), 138 Ind. 512, 37 N. E. 986, there was involved the question of the annexation of a town to that city. The question was voted on at the time of the regular city election. In South Bend there were cast 1,750 votes for annexation, and 237 votes against it. In the town there were 39 votes for, and 6 against. The total number of votes

cast for candidates at the same time, in the city, was over 5,000. The first section of the statute, authorizing the consolidation, provided that "a majority of the qualified voters of the town, and a majority of the qualified voters of the city shall vote in favor thereof." The sixth section, relating to the canvass and return, provided that if "a majority of the votes given * * * in favor of * * * annexation," a declaration of union should follow. This court held that only the voters who voted on the proposition could be considered in fixing the basis for the determination of the majority. There appears much conflict in the conclusions reached by various courts of last resort as to the proper basis for calculation under statutes similar to the Minnesota, Washington and Indiana ones above noted. In the monographic note to *State* v. *Clausen,* 45 L. R. A. (N. S.) 715 *et seq.,* appears a comprehensive collection of authorities on the subject. In our judgment, by the greater weight of American authority, under statutes of the character indicated, blank and illegal ballots must be rejected in fixing the basis. In this case, however, as we view the statute, it is essentially different from those above discussed, and eliminates from serious consideration important questions presented by those statutes or others of like import. This statute fixes the "legal votes cast" as the basis. Had the election been held by paper ballots instead of machines, it is manifest that a blank ballot cast could not be deemed a legal vote. If the voter honestly, but through ignorance or carelessness, failed to mark his ballot in substantial compliance with the provisions of §4, *supra,* of the act, the ballot deposited could not constitute a legal vote. And so with voting on the machine. One who, through ignorance or carelessness, failed to so adjust the voting key as to register his choice cannot be held to have cast a legal vote. In our opinion, under the provisions of the Proctor Act the decision of the trial court was correct, and its judgment is affirmed.

NOTE.—Reported in 107 N. E. 2. As to irregularities that will render an election void, see 90 Am. St. 46. As to whether the use of a voting machine is a violation of the constitutional requirement that all elections shall be by ballot, see 7 L. R. A. (N. S.) 621; 24 L. R. A. (N. S.) 188; 2 Ann. Cas. 840; 12 Ann. Cas. 474. See, also, under (1, 2) 15 Cyc. 364; (3) 15 Cyc. 372; (4) 23 Cyc. 102.