**BURNETT, et, v. WOOSTER, et.**

Common Pleas Court, Lake County.

No. 22576.   Decided November 19, 1948.

Theodore R. Zettelmeyer, Willoughby, for plaintiffs.
A. C. Knight, Willoughby, Lester W. Donaldson, Painesville, former Pros. Atty, Thomas H. Blakely, Painesville, Pros. Atty., for defendants.

**OPINION**

By SLOCUM, J.
This action involved the contest of an election and was brought under favor of Chapter 7 of the General Code of Ohio.

Secs. 4785-166 to 4785-174 inclusive, GC control election contests, the procedure being entirely statutory must be strictly construed.

In the election at issue held on October 5, 1948, in the unincorporated area of Willoughby Township Ohio, on the question of approving zoning regulations adopted by the Township Trustees, some 488 persons voted in favor of zoning, some 431 against it, and some 1,001 apparently entered the voting machines and were counted by the machines. It thus appeared that 82 persons failed to register a vote either for or against these regulations, but of those who actually did express their views 57 more persons voted for the issue than against it.

This election was held under the provisions of §3180-35 GC which provides as follows:

"Sec. 3180-35 GC. Zoning plan to be submitted to electors; majority vote required for approval.

"If the zoning resolution is adopted by the board of township trustees, the board of township trustees shall cause the question of whether or not the proposed plan of zoning shall be put into effect to be submitted to the electors residing in the unincorporated area of the township included in the proposed plan of zoning for their approval or rejection at the next primary or general election, or a special election may be called for this purpose. No zoning regulations shall be put into effect unless a majority of the vote cast on the issue is in favor of the proposed plan of zoning. Upon certification by the board of elections the resolution shall take immediate effect if the plan was so approved. (122 v. 597 (608), §35. 9-25-47.)"

The contestors and the contestees both rely upon the decision of the Supreme Court in the case of the City of Wellsville et al v. Connor, 91 Oh St 28, 109 N. E. 526. It involved a proceeding brought in the Common Pleas Court of Columbiana County to enjoin the issuing of bonds of the City of Wellsville for the purpose of constructing a municipal electric lighting plant. A number of blank ballots and a number of unintelligible ballots were cast at the election, and if these were counted against the proposition it would have lost. Sec. 3947 GC, then in effect under which that election was held read as follows: "If two-thirds of the voters voting at such election upon the question of issuing the bonds vote in favor thereof, the bonds shall be issued."

The language of the section under which the election was held in the Wellsville case and in the instant case is very similar. The pertinent language of the Wellsville case is "voting at such election upon the question of issuing the bonds." That on the instant case is "a majority of the vote cast on the issue."

The first syllabus of the Wellsville case is as follows: "Where the question of issuing bonds by a municipality pursuant to §3939 et seq., Page & A. GC, is submitted to the electors at a special or general election, in ascertaining whether two-thirds of the voters voting at such election upon the question of issuing the bonds have voted in favor thereof, as required by §3947 GC, blank ballots or unintelligible ballots are not to be considered."

The Court is of the opinion that the Wellsville case applies to and controls the case at issue for the following reasons: In that case the lower courts enjoined the issue but the Supreme Court reversed the lower courts on the ground that it was not necessary for the question to receive two-thirds of all the votes cast at the election including the blank and unintelligible ballots, but it was only necessary for the question to receive a two-thirds vote of those actually voting at the election upon the question. The Court further held that those persons who put blank and unintelligible ballots into the ballot box had not expressed their opinion upon the question and therefore such votes should not be counted. The reasoning of the Court appears **91 Oh St.** at page 33, 109 N. E. at page 527, as follows: "By analogy if it is impossible to determine the answer of an elector to a question submitted at the election, his ballot should not be counted upon that question. A ballot is merely the instrument by which a voter expresses his choice between candidates or on a question; and, where the voter expresses no choice, he has not voted for either candidate, nor on the question. If upon any proposition the law requires that there shall be a majority of the votes cast at the election in order that the proposition should carry, it would be necessary to reckon with his vote. But if it is necessary to have a majority of those voting at such an election upon the question, his vote would not be reckoned with, for he did not vote upon the question."

The contestors contended that this case supports their position because of the following language found in the second syllabus of the case: "Where a voter at an election duly held does not, by his ballot, express his choice for an office to be filled, or on a question submitted to the electors, his ballot should not be counted for such office or on the question. But

if it is required by law that a majority, or any certain proportion of the votes cast at the election, should be in favor of a proposition in order that it should carry, then all the votes cast at the election, including blank and unintelligible ballots must be considered."

It would thus appear that the pertinent words in the above language are "cast at the election," and that the statute in the Wellsville case and the case at issue, do not require that the question receive a majority of all the votes cast at the election but only a majority of the votes actually cast on the issue; and that therefore blank and unintelligible votes whether cast under the old paper ballot system or by means of the voting machine should not be counted. This view is also supported by the case of Spickermon et al. v. Goddard et al. The case was decided in the Supreme Court of Indiana on December 10, 1914, and is reported in 182 Ind. 523, 107 N. E. 2, 2 L. R. A. 1915C, 513, the third and fourth syllabi of the case reads as follows:

"Where voting machines were used in a local option election, and it appeared that there was a difference of 497 between the poll list number and the number of votes cast, it would be presumed that such number intentionally refrained from voting, or through ignorance of the working of the machines failed to so adjust the voting key as to register their intentions."

"Proctor Act (Burns' Ann. St. 1914, §8322) §7, provides that, if a majority of the legal votes cast at a local option election shall favor prohibition, it shall thereafter be unlawful to grant a license to sell liquor, and the board of commissioners shall have no power to hear applications for licenses in such territory until at a subsequent election a majority of the legal voters voting at such subsequent election shall vote against prohibition. Held, that the term 'majority' as so used did not contemplate a majority of all the electors taking part in the election, but meant a majority of the legal votes cast, and where 497 more were shown by the poll list than the number of votes shown to have been cast by the voting machine, the 497 should not be considered in determining the majority."

This view is apparently supported by the vast majority of the authorities. See 131 American Law Reporter, page 1382, et seq. In this connection it is noted that the Wellsville case is cited at page 1386 as sustaining the majority view.

It was also urged by the contestors that there was a change in the map of the territory included in the proposed zoning regulations as certified by the Township Zoning Commissioners between the time of certification and the date of the holding of the election. The contestors relied upon §3180-33 GC, which reads as follows: "No change in or departure from the text or maps as certified by the township zoning commission shall be made unless the same be first submitted to the township zoning commission for its approval, disapproval or suggestions. If such changes are disapproved by the township zoning commission the provision so disapproved must receive the favorable vote of the entire membership of the board of township trustees in order to be adopted."

They claimed that the fact that the Village of Eastlake became incorporated between the time of the new certification and the time of the holding of the election constituted a change in or departure from the text and maps of the zoning commission. In order to understand the meaning of §3180-33 GC it is necessary to read the sections preceding and following this particular section.

"Sec. 3180-20 GC provides that the Township Zoning Commission submit a plan, including the text and maps to the Township Trustees. Sec. 3180-30 GC provides that before submitting its recommendation of the zoning plan to the Board of Township Trustees, the Township Zoning Commission shall hold at least one (1) public hearing thereon. Sec. 3180-32 GC provides that after receiving the certification of the zoning plan from the Township Zoning Commission, the Township Trustees shall hold a public hearing thereon. Then the next §3180-33 GC, which is relied upon by the plaintiffs, provides that no change in or departure from the text or maps as certified by the Township Zoning Commission shall be made unless the same be first submitted to the Township Zoning Commission for its approval, disapproval or suggestions."

From the contents of this section and those preceding and following it, the Court is of the opinion that it is clearly the intent and meaning of the legislature that no change in or departure from the text and maps shall be made by the Board of Township Trustees, but this is the only change or departure in the text and maps that is contemplated in this section, and has no application to the situation where a portion of the unincorporated area of the township is withdrawn by operation of law by forming a corporation, since

this withdrawal could be effected at any time before, during, or after the adoption of zoning by the incorporation of any area in the township. In this connection it was stipulated that between a fifth and one sixth of the unincorporated area of Willoughby Township was withdrawn from the area of the proposed zoning regulations by the incorporation of this village of Eastlake. The evidence also showed that this withdrawal did not change the overall plan of the zoning regulations and that the voters in this village of Eastlake did not vote on the zoning issue.

There was also some complaint on the part of the contestors to the effect that the Board of Elections failed to properly instruct the electors and "that the voting officials violated §4785-131 GC in refusing electors a second ballot." However, the contestors in making this complaint apparently overlooked the provisions of §4785-110a GC, which provides as follows: "The provisions of §§4785-110, 4785-127 and 4785-131 GC shall not apply to those counties which have adopted voting machines under the provisions of §4785-161 et seq GC.

The Court has seen fit to pass on the question of the change of the map as certified by the township zoning commissioners although perhaps it is not strictly in question on an election contest. This question is apparently one of first instance in Ohio. He has done so because there is another case filed in behalf of one of the owners of property included in the area in dispute involving this question, this case being No. 22574 of the docket of this Court and entitled Charles R. Williams et al. v. Ethel Wooster, etc., et al. (unreported.) It is also to be noted that there is still another case in this Court concerning this zoning issue awaiting decision in the Supreme Court of Ohio all of which tends to show the diligence of the opponents of this measure and their counsel.

Prevailing counsel will therefore draw a Journal Entry in accordance with this opinion and submit the same to opposing counsel and the Court for approval noting proper exceptions.