KELSO *v.* COOK, SECRETARY OF STATE, ET AL.
AND
CASSADY *v.* MOTE.

.[Nos. 22,977 and 22,996. Filed January 5, 1916.]

1. ELECTIONS.—*Primary Election Law.—Constitutionality.—"Election."—"Primary Election.".*—While "election" in its broad sense signifies a selection of one from the number of those choosing, the term "all elections" as used in §2, Art. 2 of the Constitution, relating to the qualifications of voters, means popular elections at which the electors make a final choice from a number of candidates seeking election to office, and does not include "primary elections," which are elections whereby the respective political parties choose candidates for the various offices to be filled; hence the Primary Election Law of 1915 (Acts 1915 p. 359), is not invalid as contravening such constitutional provision by prescribing different qualifications for voting in primary elections. pp. 182, 183, 188, 191.

2. CONSTITUTIONAL LAW.—*Construction of Constitution.*—The intent of the people in adopting a constitutional limitation must be given effect when ascertained, and in seeking such intent, if concealed in ambiguous phraseology, courts may properly resort to other relevant provisions of the instrument, to the history of the times, the then existing laws, the mischiefs existing, and the appropriate remedies. p. 183.

3. CONSTITUTIONAL LAW.—*Construction of Constitution.*—In the construction of an ambiguous constitutional provision, a legislative interpretation thereof, especially if acquiesced in for a long period of time, is entitled to great consideration. p. 183.

4. ELECTIONS.—*"General Election."—"Special Election."—Constitutional Provisions.*—A "general election" ordinarily means an election for the selection of officers to serve after the expiration of the terms of former ones, while a "special election" is one to fill a vacancy in office, or at which some measure or proposition is submitted to electors, and at all such elections, general or special, §2, . Art. 2, of the Constitution governs as to qualifications of electors. p. 188.

5. ELECTIONS.—*Primary Election Law.—Constitutionality.—Test of Party Affiliation.*—The provisions of §10 of the Primary Election Law (Acts 1915 p. 359) for a test of the party affiliation of a person desiring to vote at a primary, are not in contravention of §2, Art. 2, of the Constitution, prescribing the qualifications of voters, since in the absence of some such test party organizations might be destroyed, and such result was not the purpose of such constitutional provision. pp. 188, 191.

6. ELECTIONS. — *Primary Election Law. — "General Election." — "Special Election."*—Primary elections held under the act of 1915

(Acts 1915 p. 359), are general elections, and not special elections, since they occur at regular intervals. p. 190.

7. STATUTES.—*Construction.*—In interpreting a statutory provision, other relevant portions thereof, and its purpose, and common-law rules, should be considered. p. 191.

8. ELECTIONS.—*Primary Election Law.—Constitutionality.*—Section 10 of the Primary Election Law (Acts 1915 p. 359) providing the qualification of voters desiring to vote at a primary election, and providing that any voter may be challenged for lack of adherence to the party whose ballot he demands, is not in violation of §13, Art. 2 of the Constitution, providing that all elections by the people shall be by ballot, etc., on the theory that any qualified legal voter of the precinct, regardless of party, may challenge any one demanding any party ballot, for lack of adherence to the party whose ballot he demands, since the statute contemplates that such challenge shall be only by members of the party whose ballot the person so challenged desires to vote, and the test in the form of a fealty oath, being solely for the benefit of the particular party whose right is involved, may be waived by it, in which event members of no other party may question the voter's right. pp. 192, 193, 194.

9. CIVIL RIGHTS.—*Waiver.*—One may waive any right conferred for his own benefit, whether contractual, statutory or constitutional, unless the relinquishment is detrimental to the public. p. 192.

10. ELECTIONS.—*Primary Election Law.—Challenge of Voters.*—Under the Primary Election Law of 1915 (Acts 1915 p. 359), any voter of the precinct may challenge any nonresident who offers to vote, and, though there is no challenge, a nonresident who votes is not relieved of the penalty for such violation. p. 194.

11. ELECTIONS.—*Primary Election Law.—Constitutionality.*—Section 10 of the Primary Election Law (Acts 1913 p. 359) requiring a voter, challenged on the ground of party allegiance, to take the prescribed oath of prior party fealty if he desires to vote, is not violative of §13, Art. 2, of the Constitution, providing that all elections by the people shall be by ballot, since, though such constitutional provision contemplates a secret ballot, it does not prohibit a voluntary disclosure by the voter as to how he has voted or intends to vote. p. 194.

12. WORDS AND PHRASES.—*"Political Party."*—A political party is an association of voters believing in certain principles of government, formed to urge the adoption and execution of such principles in governmental affairs through officers of like beliefs. p. 196.

13. ELECTIONS.—*Primary Election Law.—Constitutionality.*—Section 10 of the Primary Election Law (Acts 1915 p. 359), providing that each qualified voter of the precinct who at the last preceding general election voted for a majority of the regularly nominated candidates of the party whose ballot he proposes to vote at the primary shall be entitled to vote at it, etc., is not violative of §23, Art. 1, of the Constitution, relating to privileges and immunities,

on the theory that a voter, though qualified by registration prior to the preceding general election, is excluded from the right to vote at the primary if he failed to vote at such general election, while one who was too young to register and vote at such general election may be permitted to participate in the primary, since such exclusion is not an unreasonable provision for the protection of political parties against fraud. p. 198.

14. ELECTIONS.—*Primary Election Law.—Constitutionality.*—Section 10 of the Primary Election Law (Acts 1915 p. 359) prescribing the qualifications of voters to participate in elections held thereunder, is not violative of §1, Art. 2, of the Constitution, declaring all elections shall be free and equal. p. 198.

15. ELECTIONS.—*Primary Election Law.—Constitutionality.*—Section 23, Art. 1, of the Constitution does not preclude a reasonable classification in legislative enactments; hence §14 of the Primary Election Law (Acts 1915 p. 359) does not contravene its provisions by requiring the nominations for Governor and United States Senator to be made by a State-wide primary and the nominations for other State offices to be made by State conventions, since the character of the offices affords ample reason for the classification. p. 199.

16. ELECTIONS.—*Primary Election Law.—Constitutionality.*—The Primary Election Law (Acts 1915 p. 359) does not violate either §2, Art. 2, or §5, Art. 5, of the Constitution, by reason of the provisions for second choice voting, notwithstanding the Constitution contemplates a single vote by each elector, since the election provided for by the act is not the election contemplated by such constitutional provisions. p. 199.

17. ELECTIONS.—*Primary Election Law.—Constitutionality.*—That portion of §13 of the Primary Election Law (Acts 1915 p. 359) requiring candidates to pay into the State and county treasury a fee equal to one per cent of the annual salary of the offices they seek, is violative of §23, Art. 1, of the Constitution, which forbids any classification resting on an arbitrary basis. p. 201.

18. STATUTES.—*Partial Invalidity.—Primary Election Law.*—The invalid portion of §13 of the Primary Election Law (Acts 1915 p. 359) which provides for the payment of fees by candidates, does not affect the validity of the other provisions of the law. p. 202.

19. CONSTITUTIONAL LAW.—*Constitutionality of Statute.—Right to Question.*—One can not question the constitutionality of a statutory provision unless he shows that some right of his own is thereby impaired or prejudiced. p. 203.

20. APPEAL.—*Review.—Disposition of Cause.*—Where the trial court attained the right result in determining the rights of one who was questioning the constitutionality of the Primary Election Law (Acts 1915 p. 359) its judgment will be affirmed, even though such judgment may have been upon an erroneous theory that the particular feature of the law attacked was unconstitutional. p. 203.

From Floyd Circuit Court; *John M. Paris,* Judge.

From Marion Circuit Court (25,858); *Louis B. Ewbank,* Judge.

Action by Charles D. Kelso against Homer L. Cook, Secretary of State, and others, and from a judgment for defendants, the plaintiff appeals. Also an action by Carl H. Mote against Horace G. Cassady, in which defendant appeals from a judgment for plaintiff. The actions were consolidated on appeal for the purposes of argument and decision. *Affirmed.*

*Charles D. Kelso,* for appellant Kelso, and *Evan B. Stotsenburg* and *Carl H. Weyl,* for appellant Cassady.

*Evan B. Stotsenburg, Abram Simmons, Horace M. Kean, Leslie R. Naftzger, Omer S. Jackson, Michael A. Sweeney* and *Wilbur T. Gruber,* for appellees Cook, *et al.*

*Addison C. Harris* and *W. H. Thompson,* for appellee Mote.

*Edward R. Lewis, Willitts A. Bastian* and *Elias D. Salsbury, Amici Curiae.*

MORRIS, C. J.—The above appeals, involving the constitutional validity of the Primary Election Law of 1915, were consolidated for oral argument and decision.

Appellant Kelso, as a taxpayer of Floyd County, filed his complaint against Cook, secretary of state, Miller as auditor, and Johnson as clerk of the circuit court, of Floyd County, to enjoin them from the performance of certain acts required of them by designated sections of the primary act (Acts 1915 p. 359), because of the alleged invalidity of the law. The trial court adjudged the entire act valid, ex-

cept that portion of §13, relating to fees of candidates, which was held unconstitutional. Appellees Cook, *et al.*, have here assigned cross errors based on the court's ruling on said provision of §13.

Mote, appellee, in his appeal filed his complaint for himself and others similarly situated, against appellant Cassady, in the Marion Circuit Court alleging, among other things, that appellee is forty years old and is a citizen of the United States and has resided for more than a year in a certain precinct in Center Township, in Marion County, and expects to maintain his residence there until the end of the year 1916; that at the last registration he was duly registered as an elector in such precinct; that at the general election of 1914, he voted in said township for a majority of the candidates of the Progressive party, and was then an adherent of such party; that afterwards, but more than a year ago, he withdrew his membership in the Progressive party and since then has been, and intends to be, a member of the Republican party and intends to vote for a majority of the candidates on the Republican ticket at the general election in November, 1916, and desires, and intends, to participate in the March, 1916, primary election, and vote in said precinct for his choice of candidates of the Republican party, and further intends at the ensuing general election to vote for the candidates on the Republican ticket. It is further alleged that appellant Cassady is now, and long has been, and will continue to be, during the year 1916, a duly qualified and registered voter in said precinct; that he has been for years, is now and will continue to be, during the year 1916, a member of the Democratic party; that he voted the Democratic ticket in 1914, and will do so in 1916; that he intends to participate in the primary

election in March, 1916, in said precinct, and threatens to, and will, unless enjoined, challenge appellee's right to vote for Republican candidates at such primary for the reason that appellee did not, at the 1914 election, vote for a majority of the candidates on the Republican ticket; that because of the provisions of §10 of the primary law such challenge must be sustained, and appellee will thereby be prevented from participating in the choice of Republican candidates. Section 10 of the act is set out and averred to be unconstitutional and void, and an injunction is prayed for, enjoining appellant Cassady from challenging appellee when he offers to vote at the coming primary. Appellant Cassady's demurrer to this complaint was overruled. He declined to further plead and judgment was rendered for appellee, and enjoining Cassady from challenging Mr. Mote on account of the fact that he had not voted in 1914 for a majority of the party nominees on the Republican ticket.

The act in question provides for a State-wide primary election for the selection of candidates of any political party that cast as much as ten per cent of the total State vote at a preceding general election. Its provisions include nominations for township, city, county, congressional, and judicial offices, and Governor and United States Senator. It also provides for the selection by each of said parties, of precinct committeemen and delegates to State conventions, but requires nominations of State officers, other than Governor and United States Senator, to be made by delegates at State conventions. At the present time the act applies only to the Democratic, Republican and Progressive parties. The act requires a separate primary for each participating political party with separate, different colored tickets and ballot boxes for each,

but all such primaries must be held at the same time and place, and under the control of a single set of election officials.

Section 10 prescribes the qualifications of voters, and reads as follows: "Each qualified voter of the precinct who, at the last preceding general election, voted for a majority of the regularly nominated candidates of the party holding such election, shall be entitled to vote at such election, provided such elector was registered as a voter at such previous general election; and *Provided, further,* That if such elector was not so registered, he shall make the affidavit hereinafter provided for. It shall be the duty of the county auditor to furnish to the inspector of elections in each of such precincts a copy of the book of the registration of voters of such precinct for the preceding general election. If the name of such person offering to vote at such primary shall be found on such registration book, it shall be sufficient evidence of his right to vote, unless he be challenged as hereinafter provided for. Any person who will be a qualified elector at the election for which such primary is being held, whose name does not appear on such book of registration, shall be entitled to vote if he shall make affidavit that he is a qualified voter of such precinct. Any qualified legal voter in such precinct may challenge any voter or person who shall offer to vote at such election, and when so challenged, such person shall not be entitled to vote unless he shall make an affidavit that he is a qualified legal voter of the precinct; that at the last preceding general election he affiliated with the party for whose candidate he proposed to vote in such primary, that he voted for a majority of the regular nominees of such party; and that he intends to support and vote, for the regular nominees of such party at the coming elec-

tion. *Provided,* That any qualified legal voter who was under twenty-one years of age at the last preceding election, and who will have attained the age of twenty-one years prior to the ensuing election shall be entitled to vote at the primary of the party with which he intends to affiliate, and whose candidates he intends to vote for at the approaching election, and whenever any such person last named is challenged, it shall be sufficient if he shall make affidavit that he will be a qualified legal voter of the precinct at the next general election, and that he intends to support and vote for the regular nominees of the party for whose candidate he proposes to vote for in such primary."

Section 13, among other things, requires each candidate for nomination to pay into the State or county treasury a sum equal to one per cent of one year's salary for the office which he aspires to hold, and in default of which his name can not be printed on the official ballot.

Section 22 provides that the elector shall state his name and party affiliation to the election clerks who shall thereupon deliver to him the proper ballot. Section 23 authorizes him to express his first and second choice for candidates for each office. Section 38 fixes a penalty for voting, or offering to vote, without legal qualifications. Section 58 makes applicable to these primaries consistent provisions of the general election laws. Section 59 repeals the Primary Election Law of 1907.

It is urged by appellant Kelso and appellee Mote that §10 of the act, fixing the qualifications of primary election voters, violates §2 of article 2 of our Constitution which provides that, "In all elections not otherwise provided for by this constitution every male citizen of the United States, of the age of 21 years * * * who shall have resided * * *

in the township sixty days, and in * . * * the precinct thirty days, immediately preceding such election ' * * * shall be entitled to vote in the * * * precinct where he may reside, if he shall have been duly registered * * * ''. Kelso further insists that if said §10 be invalid the whole act must fall, because of the dependence on such section of other vital provisions of the law. We concur in this latter view. That §10, *supra*, fixes qualifications different from those prescribed in said §2 of article 2, and, read in connection with other provisions, limits participation in the primaries to voters adhering to parties theretofore casting a definite minimum vote, is manifest and conceded. Does this constitutional provision control the voters' qualifications in such primary election as is here involved? If so, the act must be held void.

Article 2 of our Constitution contains fourteen sections, each relating to elections. Section 1 of the article declares that ''All elections shall be free and equal''. Section 6 provides that one who has offered or given a bribe to secure his election shall be disqualified for holding office during the term for which he may have been elected. Section 13 declares that ''All elections by the people shall be by ballot; and all elections by the general assembly, or by either branch thereof, shall be *viva voce*''. Section 14, among other things, provides that ''all general elections shall be held on the first Tuesday after the first Monday in November''. Section 1 of article 15 reads as follows: ''All officers whose appointments are not otherwise provided for in this constitution shall be chosen in such manner as now is, or hereafter may be, prescribed by law''. Section 1 of article 16 provides for the submission of proposed constitutional amendments to all the electors of the State for adoption or rejection.

Our Constitution was adopted in 1851. Section 2 of article 2, *supra*, was amended in 1881. And the amendment changed the provisions fixing the qualifications of voters. Section 23 of our Bill of Rights (Constitution, Art. 1) prohibits the granting to a citizen or class of citizens, privileges or immunities which, on the same terms, shall not equally belong to all citizens. Section 31 of the same article declares that no law shall restrain any of the inhabitants of the State from assembling together in a peaceable manner, to consult for their common good; nor from instructing their representatives.

In determining the question of the application of §2 of article 2, *supra*, to this act it is insisted that the term "all elections" must necessarily 1. comprehend the broadest definition of the word "election;" that a primary election clearly falls within the scope of the definition of "all elections," though it be conceded that there is a radical difference between an election of public officers and a primary one to select candidates for office by a political organization. In its broad sense the word "election" signifies a selection of one from the number of those choosing. 9 R. C. L. 977. The word occurred so often in our statutes, in force in 1881, when this constitutional provision was adopted by the people, that it would involve a needless task in pointing out all the instances. Suffice it to say that at that time laws were in force regulating the election of trustees of churches, lodges and other religious and charitable associations (1 R. S. 1852 p. 459); the election of officers of private corporations (1 R. S. 1852 p. 239); and the election of officers of the State militia (Acts 1861 [s. s.] p. 52, §5369 R. S. 1881). To claim that the people, in 1881, when they adopted the amended §2 of article 2, *supra*, intended the term "all elections" to in-

clude elections of officers of churches, private copora-
tions and militia companies would be absurd, and
we are forced to conclude that a limited definition
must be accorded the term. Conceding some limita-
tions, however, Is the term still broad enough to
include primary elections? The intent of the peo-
ple in adopting a constitutional limitation
2. must be given effect when ascertained. In .
seeking this intent, if concealed in ambiguous
phraseology, courts may properly resort to other
relevant provisions of the instrument, to the history
of the times, the then existing laws, the mischiefs
existing, and the appropriate remedies. 6 R. C. L.
51. They should not view the controverted phrase
from the standpoint of the mere word-caviler, or that
of one content to permit a technical construction to
limit and obstruct the natural development and
progress of a free people. *Spickerman* v. *God-
dard* (1914), 182 Ind. 523, 107 N. E. 2, L. R. A.
1915 C 513; 6 R. C. L. 46, 47; *South Carolina* v.
*United States* (1905), 199 U. S. 437, 26 Sup. Ct.
110, 50 L. Ed. 261, 4 Ann. Cas. 737. Another
recognized rule of construction of ambiguous
3. constitutional provisions is that a legislative
interpretation, particularly when acquiesced
in for a long period of time, is entitled to great con-
sideration. *State, ex rel.* v. *Gerdink* (1909), 173
Ind. 245, 251, 90 N. E. 70; 6 R. C. L. 63, 64.

Before and since 1881, the legislature provided for
the "election" of county superintendents of schools
by township trustees. Acts 1873 p. 75,
1. §5900 Burns 1894. Trustees of school cities
and towns have been "elected" by city coun-
cils and town trustees since 1875, at least. Acts
1875 p. 135, §5915 Burns 1894. The act of March 6,
1865, provided for the annual "election" (Acts
1865 p. 3, §4498 R. S. 1881, §6589 Burns 1914) of

school directors by electors of school districts consisting of (§14 Acts 1865 p. 3) heads of families, male and "*female*," and guardians of minors. That any such election conflicted with the constitutional provision in question was never suggested. Primary elections are not new. They were probably in vogue in some counties, as early as 1851. In 1881 they had become fixed by party usage in many of the counties, and the method was well understood by the voters of the State when, in 1881, they adopted the section in question. In 1869 the General Assembly passed an act that required election judges to be appointed from the two political parties casting the highest number of votes. Acts 1869 (s. s.) p. 58. Similar provision is found in subsequent election laws. The General Assembly of 1877 enacted an election law, §7 of which authorized any political party, having candidates to be voted for to be represented at the count of votes by two witnesses to be selected by the party central committee or by the "*voters of the respective parties*". Acts 1877 p. 38. The same General Assembly (1877) proposed for submission to the electors of Indiana §2 of article 2, of our Constitution, in its present form. Eight years after the adoption of the controverted section of the Constitution, the legislature enacted the Australian Ballot Law, which, among other things, sought to protect political parties in the nomination of candidates for office by means of voluntary direct primary elections. Acts 1889 p. 157, §18, §6899 Burns 1914. That law still remains in effect. Section 4 of the same act, authorizes in certain cases, the selection of judges on election boards by primary elections. Acts 1889 p. 157, §6201 Burns 1894. Other provisions of the same act protected and regulated the acts of political parties done in conventions, primary elections and

by political committees, and these provisions are still in effect. §§6886, 6896, 6897, 6898,· 6899, 6906, 6908, 6909, 6923, 6927 Burns 1914, Acts 1889 p. 157, Acts 1891 p. 124, Acts 1897 p. 49. The legislature of 1897 prohibited nominations by fusion of political parties. Acts 1897 p. 49, §6900 Burns 1914. An act of 1901 authorizes the presence of political party watchers at the counting of ballots. Acts 1901 p. 525, §6934 Burns 1908. The right, under the act of 1889, of political parties to have placed on official ballots the names of their nominees, under their party emblems, where the nominations are made at the time and place "designated in the call of the regularly constituted party authorities" was upheld by this court in *State, ex rel.* v. *Board, etc.* (1906), 167 Ind. 276, 78 N. E. 1016.

In 1901 (Acts 1901 p. 495, §6339c Burns 1901) a primary election law was enacted, mandatory in counties containing a city with a population of 50,-000 or more, and optional in all other counties. It was entitled "An Act for the purification of primary elections," etc., and provided for the organization of political parties, the election of officers thereof, including precinct committeemen, and authorized, at the option of the party officials, the selection of party candidates by direct vote of party adherents. It also defined the qualifications of electors, substantially as in §10, *supra*, here. The act was construed, in some particulars, in *State, ex rel.* v. *Elliott* (1902), 158 Ind. 168, 63 N. E. 222. This act was superseded by that of 1907. Acts 1907 p. 627, §7055 Burns 1914. That enactment was mandatory as to parties casting ten per cent of the total vote, in all counties containing cities with a population of 36,000 or more, and optional in other counties. It required the election of precinct committeemen of each of such parties at separate places

by direct vote of electors. It prescribed voters' qualifications, that were substantially, and, in the main, literally, copied in §10, *supra*, here. It required the nomination of party candidates for county, city and township officers by party primary elections. It expressly provided that it did not apply to nominations for State and National officers nor to the selection of delegates to State or National party conventions. This act was superseded by the enactment in controversy. Meanwhile, in 1905 (Acts 1905 p. 122), a so-called primary act was passed, applicable only to Terre Haute and Vigo County, providing for the election of precinct committeemen, and the nomination of candidates for office by parties casting ten per cent of the vote. At these primaries all persons were permitted to vote who would be qualified therefor at the succeeding general election. It enabled the Republicans to select the precinct committeemen and candidates of the Democratic party and with equal liberality bestowed on Democrats, Socialists and Prohibitionists the right to dictate the selection of committeemen and candidates of the Republican party. The only discordant note in the harmony of freedom pervading the act was the positive edict against voting more than once. The law can only be characterized, however, incongruously, as providing for a nonpartisan primary of party organizations. If the people of Terre Haute and Vigo County ever desired the act to live they were disappointed, for it was repealed by the succeeding legislature.

In *Gray* v. *Seitz* (1904), 162 Ind. 1, 69 N. E. 456, the construction of §6, Art. 2, of our Constitution, was involved. A person who was elected county auditor had, as alleged, been guilty of securing his nomination at a voluntary primary election of his party by means of bribery. It was contended that

he became thereby disqualified from holding the office. In holding that the constitutional provision did not apply to primary elections, this court said: "It seems perfectly clear that §6, Art. 2 * * * applies only to bribes * * * given or offered to secure the election of a candidate at a final or popular election. No mention is made of a primary election, and ˉthe language used refers exclusively to the election by virtue of which title to the office is claimed". Appellant Kelso claims that the opinion declares an erroneous doctrine. We cannot assent to such conclusion. In *State* v. *Paris* (1913), 179 Ind. 446, 101 N. E. 497, this court said: "The words 'primary election' are well understood to mean the act of choosing candidates by respective political parties to fill the various offices, as the word election is understood to mean the final choice of electors to fill such offices". In *State* v. *Hirsch* (1890), 125 Ind. 207, 24 N. E. 1062, 9 L. R. A. 170, in discussing the characteristics of elections and primary elections it was said: "The respective parties first make choice of candidates, and secondly all of the electors make choice between the various candidates; and the words 'primary election' well express the choice made by the respective political parties". The appellee in that case was charged with selling liquor at Winchester, on the day of a voluntary primary election, in alleged violation of a statute which forbade the selling of liquor on the "day of any election in the township, town or city where the same may be holden". In its opinion on page 215 the court considered the act of 1889 which made it a crime to influence voters at voluntary primary elections, by money or other designated means, and properly held, as we consider it, that, in view of the mischief sought to be remedied, the statute (§2098 R. S. 1881, §2194

Burns 1901) was broad enough to comprehend sales of liquor on primary election days.

By the term "general election" is usually meant the selection of officers to serve after the expirations of terms of former ones. By "special election" we usually understand one to fill a vacancy in office or, at which some measure or proposition is submitted to electors. *Spickerman* v. *Goddard, supra;* 15 Cyc 279; 9 R. C. L. 978. Proposed constitutional amendments have been submitted at a special election (Acts 1881 p. 31) and a proposition for a constitutional convention has been submitted to the voters at a general election. Acts 1913 p. 812. At all such elections, general or special, §2 of article 2, *supra*, governs as to qualifications of electors. *State* v. *Shanks* (1912), 178 Ind. 330, 99 N. E. 481.

Primary elections, in their origin, were creatures of voluntary political associations. 15 Cyc 279. They were employed especially by majority parties in localities where their preponderance was such that ordinarily a nomination meant an election. 9 R. C. L. 1072. The word "primary" itself necessarily implies, as qualifying the word "election," an election or choosing, antecedent to the final choice or "election." Twenty-five years ago this court judicially knew the well defined custom of selecting party candidates, prior to regular elections, by primary ones. *State* v. *Hirsch, supra*, 210. To assume that §2, Art. 2, governs primary elections, implies that no lawful primary can be held. The latter must be held if at all, previous to the final election, and necessarily there will be voters under twenty-one years of age at the time of the primary, but who reach their majority before the general election. This class of voters, specially

important because of long expectancy of life, has always participated in primary elections governed by party usage, but must be excluded if §2, *supra*, controls. But vastly more important, if that section controls, any elector of the precinct, though avowedly an adherent of no party, may participate on equal terms with party adherents in selecting its candidates, and the adherent of one party, with only single candidates for nominations, might, with safety to his own party, go into the camp of his political adversary and maliciously vote for its most unworthy candidates with the deliberate purpose of wrecking it. No political party ever held a voluntary primary open to others than its adherents, and it may be safely asserted that no sane organization, political, religious or otherwise, will ever voluntarily countenance such folly as permitting the selection of its officers by nonadherents. To assume that because of said constitutional provision non-Republicans may select the officers and candidates of that party, is as devoid of reason as the assumption that agnostics be permitted to elect the trustees of a church. To assert that Democratic or Progressive candidates may be selected by Republicans, Socialists and adherents of no party, is as fatuous as the idea that a military strategist ought to submit his plans for his country's defense to the commanding general of the enemy. No court has the right to impute such folly to the people (most of whom adhered to some party) who adopted this provision in 1881, or to the members of the legislatures, some of whom were nominated at direct primaries, who proposed the section, as amended. *State, ex rel.* v. *Flaherty* (1912), 23 N. Dak. 313, 136 N. W. 76, 41 L. R. A. (N. S.) 132. It was not the purpose of the constitutional provision in question to indirectly destroy political organizations, yet that would be

the necessary result if parties may not, by some test of affiliation, exclude their enemies from controlling them.

Counsel for appellee Mote, while insisting that the legislature may prescribe no test of affiliation, assert that political parties are free to voluntarily fix such tests as they desire. The test found in §10, *supra*, of this act was no doubt borrowed from the customary usage of the dominant political parties. One of the manifest purposes of the law in question, and particularly of §10, *supra*, is the protection of political parties from illegitimate outside influences, and we perceive no reason why the legislature may not expressly declare lawful a voluntary act that was actually lawful at common law. On the other hand, if said §2 of article 2 controls primary elections, and is self-executing (see 6 R. C. L. 57-62), probably all primaries heretofore held by party usage have violated its mandates; if not self-executing, the legislature clearly has the power, and is in duty bound to enact such legislation as will carry its mandates into effect, even though it destroy all party organizations, for the legislator is sworn to support, and not to evade, or nullify, the provisions of the organic law.

Appellant Kelso, in his brief, contends that the act in fixing a day in March for the primary violates §14 of article 2, *supra*, which declares that all general elections shall be held on a certain day in November. In his oral argument he waived a consideration of this contention. This waiver was unnecessary, if his contention be correct that §2 of the same article includes primary elections, for it is manifest that the primary provided for in this act, occurring at regular intervals, is in no sense a special election, but, on the contrary, is a general one. 7 Words and Phrases 6575; 4 Words

and Phrases (2d series) 631; 15 Cyc 279; 9 R. C. L. 978.

The character of an act is often best determined by viewing it from the standpoint of its results. The practical result of holding that §2 of article 2,

1. supra, covers primary elections, is their destruction whether voluntarily held by groups of electors called political parties, or involun-

5. tarily held under statutory mandate. We do not believe that the people, in adopting the constitutional provision, had any such result in mind. Viewing the question, under the rules of construction heretofore noted, and from the standpoint of the strong reasons opposing the contentions of Mote and Kelso, and considering, also, the opinions of other courts, we are of the opinion that the limitations prescribed in said §2 of article 2 are not applicable to the qualification tests found in §10, supra, of this act. Gray v. Seitz, supra; State, ex rel. v. Felton (1908), 77 Ohio St. 554, 84 N. E. 85, 12 Ann. Cas. 65; State, ex rel. v. Board, etc., supra; State, ex rel. v. Johnson (1902), 87 Minn. 221, 91 N. W. 604, 840; State, ex rel. v. Flaherty, supra; Gardner v. Ray (1913), 154 Ky. 509, 157 S. W. 1147; Dooley v. Jackson (1903), 104 Mo. App. 21, 78 S. W. 330; State, ex rel. v. Nichols (1908), 50 Wash. 508, 97 Pac. 728; State v. Woodruff (1902), 68 N. J. L. 89, 52 Atl. 294; State, ex rel. v. Michel (1908), 121 La. 374, 46 South. 430; Riter v. Douglas (1890), 32 Nev. 400, 109 Pac. 444; Ledgerwood v. Pitts (1909), 122 Tenn. 570, 125 S. W. 1036.

It is claimed that §10, supra, of the act violates §13 of article 2 of our Constitution. Both Kelso and Mote assume that any qualified legal voter of

7. the precinct, regardless of party, may challenge any one demanding any party ballot,

for lack of adherence to the party whose bal-
lot he demands, in which case the one chal-
lenged cannot vote unless he makes the pre-
scribed oath of party allegiance. A literal
8. construction of the language of the statute,
and a disregard of the law of waiver, might
warrant such conclusion, but, in interpreting a
statutory provision, other relevant portions thereof,
and its purpose, and common-law rules, should be
considered. As applicable at present, the act con-
templates a separate primary by each of the parties,
Democratic, Progressive and Republican, at the
same time and place, with nothing in common. but a
single set of officers. One of the prominent designs
of the act is to preserve the integrity and usefulness
of political parties by giving each adherent thereof a
free and equal voice in the selection of candidates
and the determination of party principles and
policies and this cannot be accomplished without
excluding those who adhere to other parties, or to no
party. Some test of affiliation is therefore neces-
sary. However, appellee Mote has changed his party
adherence, and now wishes to vote with the Republi-
cans. He cannot make the affidavit prescribed. If
the Republicans see fit to waive a challenge, may a
Democrat, with whatever motive, interpose one
and exclude him? If so, one of the purposes of the
act—exclusion of opposition party influence—will
be defeated, for it happens that at every election
many voters with the purest of motives, change their
party allegiance. One may waive any right con-
ferred for his own benefit, whether contractual,
statutory or constitutional, unless the relinquish-
ment is detrimental to the public. 40 Cyc 254.
Our Constitution (§20, Art. 1) declares that
9. in all civil cases the right of trial by jury shall
remain inviolate, yet no one ever doubted

that a party litigant in such causes may waive the right. Another provision (§13, Art. 1) declares that in all criminal prosecutions the accused shall have the right "to meet the witnesses face to face", yet even this important right may be waived. *Butler* v. *State* (1884), 97 Ind. 378. See, also, *Veatch* v. *State* (1878), 60 Ind. 291. To enumerate a small portion of the statutory rights that may be waived, though the enactments themselves make no mention thereof, would unduly extend this opinion, but see 10 Ind. Dig. Ann. 141 to 144, inclusive. "It is a recognized principle that every one may waive a right intended for his own benefit, if it can be relinquished without detriment to the community at large." *Reid* v. *Field* (1887), 83 Va. 26, 1 S. E. 395.

The statute here fixes a condition in the form of a fealty oath. In our opinion this test was intended solely for the benefit of the political parties interested, and the performance of the condition may be waived by the particular political party whose right may be involved. Such waiver contravenes no principle of public policy. The Republican party, or any member thereof, in Mr. Mote's case, has the undoubted right to challenge his vote, but if all Republicans are satisfied of the genuineness of his party affiliation and decide to waive the right of challenge, we perceive no good reason why Mr. Cassady or any other Democrat should be accorded the right to change the possible result of the Republican primary by excluding from such election one who claims to be a Republican and who has convinced that party of his good faith. Nor does a Progressive occupy a better position, unless we concede that it was the absurd purpose of the law to prevent voters from changing

party allegiance. The fealty test was adopted from voluntary rules of political parties, in force for decades, and its enactment into law was to better enable such parties to protect themselves from frauds of outsiders. It is a matter of common knowledge that at such voluntary primaries party strangers were not only denied the right to challenge voters for nonadherence, but were excluded from the buildings where the elections were being held. We are not warranted in placing such technical construction on the fealty test of §10, *supra*, as would subvert one of the manifest purposes of the statute.

However, in holding that a Democrat or Progressive may not invoke the fealty test when a voter demands a Republican ballot, we must not be understood as holding that any political party may waive the residence qualification of one demanding a ballot. The public is interested in prohibiting nonresidents of a precinct from voting. Among the many reasons for such conclusion we mention only one. If a nonresident voted in the primary at a given precinct, it would likely happen that he would attempt to vote at the same place at the succeeding general election. Any voter of the precinct may challenge any nonresident who offers to vote, but the absence of any challenge will not relieve the nonresident of the penalty for violating the law in such respect. It is claimed that the oath test, when a challenge is interposed, violates §13 of article 2, *supra*, because it requires the voter in such case to disclose how he voted at the preceding election, and how he intends to vote at the coming one. The ballot contemplated by the section is a secret one. *Spickerman* v. *Goddard, supra*. This statute does not, however, require the challenged voter to specifically state for whom he previously voted. Indeed

the test is the most liberal imaginable consistent with the exclusion of adversaries from party councils. There is nothing in the constitutional provision making it unlawful for one to voluntarily state how he voted, or how he intends to vote. When the Appellate Court was first created, the appointment of the judges was vested in the Governor, but he was not permitted to appoint more than three (of five) of them from one political party. Acts 1891 p. 39, §1382 Burns 1914. Our charitable institutions are managed by bipartisan boards. Jury commissioners must be of opposite political parties. In both State and National governments bipartisan appointments have become fixed institutions. The law compels no one to serve on such boards, but an applicant for such a position must disclose his party adherence if required, otherwise the appointing officer could not comply with his official oath in discharging such duties.

Primary election laws are not designed for nonpartisan nominations. Their sole object is to regulate nominations by *political parties*. No well-disposed person would seek to intrude on an organization whose principles he disavows, and the fealty test is designed to prevent ill-disposed ones from perpetrating frauds on political parties. In the absence of legislation, it was customary for political parties to prescribe such tests, and no one contended, nor contends, that they were unlawful. Counsel for appellee Mote, in oral argument, stated that the Republican party of Marion County had a fealty test, before the enactment of any primary law. Such test could not have been less onerous than the one here prescribed. Should he succeed in having this and previous primary laws held invalid he would nevertheless confront a fealty test, pre-

scribed by the party of his affiliation, that might be less liberal to him than this one.

A political party is an association of voters believing in certain principles of government, formed to urge the adoption and execution of such 12. principles in governmental affairs through officers of like beliefs. They have existed in some form under all systems of government where the people were accorded any political rights. They originated here with the adoption of the Federal Constitution in 1787. In a republican form of government they are a necessity. A brilliant Frenchman who visited our country at an early day (1831) and who viewed the then existing political parties with unfriendly eye, because of their passions and prejudices, said: "Parties are a necessary evil in free governments  *  *  *  . At certain periods a nation may be oppressed by such insupportable evils as to conceive the design of effecting a total change in its political constitution; at other times the mischief lies still deeper, and the existence of society itself is endangered. Such are the times of great revolutions and of great parties.  *  *  *  The political parties which I style great are those which cling to principles more than to consequences; to general, and not to especial cases; to ideas, and not to men." DeTocqueville, Democracy in America 187. Another distinguished foreign critic, viewing our political organizations of recent times says: "But the spirit and force of party has in America been as essential to the action of the machinery of government as steam is to a locomotive engine; or, to vary the simile, party association and organization are to the organs of government almost what the motor nerves are to the muscles, sinews and bones of the human body." 1 Bryce, American Commonwealth 636.

Kelso *v.* Cook—184 Ind. 173.

In Indiana's capital, a grateful people has erected monuments to four men, renowned for public service as early as 1850, 1851 when our Constitution was planned and adopted—Hendricks, Morton, Colfax and Owen. All, except Morton, were members of that convention which devised a scheme of State organic law so advanced and progressive as to survive, it is believed, all its contemporaries, excepting that of Massachusetts. The master spirit of that memorable body was Robert Dale Owen, of Posey County, who, there, amid noted achievements, led an unsuccessful effort to write into that instrument the nullification of the oppressive rules of the common law in relation to property rights of married women. However, at the succeeding session of the legislature (1852) his renewed assault was victorious, and many other American commonwealths soon followed the example of Indiana legislators. Owen's work, as a constructive statesman in establishing our common-school system, and promoting other great measures of that time is carefully reviewed in Lockwood's New Harmony Movement, chap. 25, p. 336 *et seq.* As to the other three, there is no need of reference here, for the story of their services to State and Nation is too well known. All these men were distinguished leaders in their respective political organizations, which afforded them their opportunities for moulding into law some of the great measures which claimed the attention of the statesmen of that day. Each of the great political organizations of that period had tests of party fealty, and these men, and their associates, were robust partisans. It would require more than technical theory, built on dictionary and grammar, to convince us that Colfax, Hendricks and Owen, and their associates in that great convention, intended, in providing for elections by ballot, to write the

doom of the political organizations to which they proudly claimed allegiance. Cooley, Const. Lim. (7th ed.) 93, 95; 1 Story, Constitution §§400, 454; *Spickerman* v. *Goddard, supra.* The fealty test of §10, *supra,* does not violate the constitutional provision in relation to elections by ballot.

It is also contended that §10, *supra,* violates §23, Art. 1, of the Constitution because the test of participation in a primary excludes those who were duly registered for, but did not vote at the preceding general election; that while it permits those to participate who were too young to register and vote at the preceding election, it excludes those who, in good faith, registered and intended to vote but were prevented therefrom by illness or unavoidable accident. It is erroneously assumed that this provision, in itself, disqualifies any one who was old enough to vote, and registered, but failed to vote, regardless of a challenge from the political party whose ballot such person may demand. Such is not a proper construction of the statutory provision. Its purpose was to enable the political parties to protect themselves from the perpetration of frauds by those not in good faith affiliating with them, and they may waive their respective rights of challenge in this particular, to meet such hardships as are here suggested. If not waived, we perceive nothing unreasonable in excluding those from participation in a primary who so little regarded their party adherence or their duties as citizens, as to neglect their right to vote at the preceding election. Section 10, *supra,* does not violate §23, Art. 1, of our Constitution.

It is also claimed that §10, *supra,* violates §1 of article 2, *supra,* which declares all elections shall be free and equal. We have considered the reasons urged, but are of the opinion that there

is no conflict. As against all constitutional objections presented, we hold that §10, *supra*, is valid.

Appellant Kelso further contends that §14 of the act violates said §23 of article 1, by authorizing the nomination of Governor and United States Senator by State-wide primary, while requiring nominations for other State officers to be made at State Conventions. The constitutional provision in question does not exclude reasonable classification in legislative enactment. *Indianapolis Union R. Co.* v. *Houlihan* (1901), 157 Ind. 494, 500, 60 N. E. 943, 54 L. R. A. 787. But it is claimed that this classification is wholly arbitrary. We are of the contrary opinion. Our Constitution makes the Governor the commander-in-chief of the State's military forces, and invests him with certain legislative functions, and confers on him the power to grant pardons and reprieves. The Federal Constitution makes the United States Senator a most powerful legislative officer. Probably no one ever aspired to either office who was not, or believed himself to be, well known to the electors of the State. On the other hand, the judicial and administrative officers elected by all the voters of the State simply interpret and administer the law as they find it. The performance of their respective duties brings them in actual contact with but few of the State's electors and even after long service they are apt to be personally known to only a small minority of the State's voters. There is ample reason for the classification.

It is contended by appellant Kelso, that §§14, 15, 26, 27, 28 and 29 of the act violate §2 of article 2, and §5 of article 5, and other provisions of our Constitution, in providing for second choice voting at the primary election—that our Constitution contemplates a single vote by each

elector. Were this the final election contemplated by such constitutional provisions, the objection would have much force. *Brown* v. *Smallwood* (1915), 130 Minn. 492, 153 N. W. 953. The legislature here, through an exercise of its police power, has sought not only to protect the larger political organizations from outside fraud but from inside manipulation. The primary act of 1907 did not seek to regulate the selection of delegates to State or National conventions, but left that matter wholly to voluntary party action. It has of recent years been charged that party managers, not only permitted, but connived, at the grossest frauds, in the selection of convention delegates, especially those to national conventions, which not only named the presidential candidate but formulated the declaration of principles of party adherence. Charges of fraud were also made regarding selections of candidates at county and district conventions. That these charges were believed to be true by great bodies of voters is unquestioned. That the State, in the exercise of its police power, may protect political organizations from the evils of corrupt practices by its own members, is not questioned here. This act seeks to remedy such evils by selecting delegates to State conventions by direct vote and by superseding other conventions by primary elections. At party conventions it was the universal custom to require a majority vote to nominate. This necessarily meant that second choice candidates were often selected. Indeed delegates were sometimes chosen with second choice instructions. In all cases where there were three or more candidates, with nearly equal first choice following, it was necessary for some delegates to forego their first choice or else prevent any nomination. In providing for second choice votes here, it was evidently

sought to preserve some features characterizing the convention, and thus bring about a result satisfactory to the greatest number of voters.  We are of the opinion that said sections are valid as against the objections urged.  *Ledgerwood* v. *Pitts, supra; State, ex rel.* v. *Michel, supra; Adams* v. *Landsdon* (1910), 18 Idaho 483, 110 Pac. 280; *Brown* v. *Smallwood, supra.*

It is contended by appellees Cook *et al.*, that the Floyd Circuit Court erred in holding invalid the provision in §13, *supra*, requiring candidates to pay into the State and county treasury a fee equal to one per cent of the annual salary of the offices which they aspire to hold.  The trial court was of the opinion that such provision violates §23 of article 1, of our Constitution.  It is not contended that the exacted fee was designed as recompense for the mere service of filing petitions, etc.  It does not purport to be a revenue measure.  Another section (§37 Acts 1915 p. 359) requires all expenses of the primary to be paid from the public treasury.  The provision requires the payment of a fee based on statutory salary, although it is absolutely certain that of the number of candidates for nomination for a particular office, whether three or fifty, only one can ever draw any official salary.  Indeed it is quite possible that no such candidate will be elected.  At the 1912 election many Progressive candidates for county office were elected in Indiana.  Had this law been then in effect, no member of the Progressive party could have participated, because, at the general election of 1910, the Progressive party did not cast ten per cent of the total vote.  Indeed, its candidates in 1912 got their names on official ballots by petition, because, at that time voluntary primary election nominations were not recognized except when made by a party

casting as much as one per cent of the total vote at the preceding general election. §6899 Burns 1914, *supra*. The provision would compel candidates of minority parties, in counties where they have no hope of election, to contribute the same fee exacted of candidates of majority parties. The emoluments of office are not the chief, or even a leading, object in view in the formation or perpetuation of political parties. It is well recognized especially in county and city governments, that the minority party often renders greater public service than the majority one. 9 R. C. L. 1082. It often happens that unrighteous policies are overthrown because of the patriotic courage of adherents of minority parties who permit their names to be used as candidates, though they do not desire to hold office. This provision would work serious harm to such public spirited movements.

It may be as contended, that in some jurisdictions, provisions quite similar to this have been upheld by the courts, but it is believed that, in such cases, there are constitutional provisions differing from ours. Section 23 of article 1, of our Constitution forbids classification resting on an arbitrary basis, and in our opinion it is contravened by this provision which fixes a fee arbitrarily based on salary which can have no reasonable application to the vast majority of candidates. It is urged by appellant Kelso that the provision contravenes other parts of our organic law but it is unnecessary to consider such contentions. We are of the opinion, however, that the invalidity of said fee provision does not affect the question of the validity of other provisions of the act, and that the judgment of the Floyd Circuit Court should be affirmed.

Appellee Mote, in his complaint seeks to question the constitutionality of §10, *supra*, of the act, be-

cause of alleged facts that might involve the rights of other electors of the State, but which admittedly do not affect his own. The Marion Circuit Court, in its decree, limited the relief granted to an injunction against appellant Cassady, a Democrat, from challenging Mote's right to vote at the coming Republican primary on the ground that he did not vote for a majority of Republican candidates at the last general election, or on the ground that at such election he affiliated with the Progressive party. It is thoroughly settled in Indiana that a party can not question the constitutionality of a statutory provision unless he shows that some right of his own is thereby impaired or prejudiced. *Tomlinson* v. *Bainaka* (1904), 163 Ind. 112, 70 N. E. 155; *State* v. *Gerhardt* (1896), 145 Ind. 439, 44 N. E. 469, 33 L. R. A. 313; *Currier* v. *Elliott* (1895), 141 Ind. 394, 39 N. E. 554; *Henderson* v. *State, ex rel.* (1894), 137 Ind. 552, 36 N. E. 257, 24 L. R. A. 469. Because of such settled rule we do not consider the matters pleaded which do not affect Mr. Mote's rights as citizen or elector.

It is possible that the Marion Circuit Court, in ruling on Cassady's demurrer, was of the opinion that §10, *supra*, is unconstitutional. Regardless of its theory the court reached the right result, for, as we interpret the statute, Cassady, a Democrat, has no right to challenge Mote for non-adherence to the Republican party, and consequently Mr. Mote, on the complaint's allegations, was entitled to some relief, and, therefore, the demurrer was properly overruled. Section 700 Burns 1914, §658 R. S. 1881, requires this court to affirm a judgment where it affirmatively appears that the correct result was reached, and consequently the judgment of the Marion Circuit Court should be affirmed.

In each appeal, the judgment of the circuit court is affirmed.

Erwin, J., dissents; Spencer, J., concurs in conclusion; Lairy, J., concurs in the result, in so far as the law is sustained, but does not assent to all of the reasoning.

NOTE.—Reported in 110 N. E. 987. "Primary elections" as elections within Constitution or statute relating to elections generally, see 18 L. R. A. (N. S.) 412. On the constitutionality of primary election laws, see 22 L. R. A. (N. S.) 1136; 41 L. R. A. (N. S.) 132; 5 Ann. Cas. 568; 12 Ann. Cas. 73; Ann. Cas. 1913 A 702. See, also, under (1) 15 Cyc 279, 332; (2) 8 Cyc 730, 735; (3) 8 Cyc 737; (4) 15 Cyc 279; (5) 15 Cyc 279; 15 Cyc Anno. 279; (9) 40 Cyc 254; (11) 15 Cyc 346; (12) 15 Cyc 326; (13) 15 Cyc 332; (15, 17) 8 Cyc 1051; (18) 36 Cyc 982; (19) 8 Cyc 798; (20) 3 Cyc 221.